2:18-cr-00112-JCM-VCF - March 14, 2019

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,     )
                                   ) Case No. 2:18-cr-00112-JCM-VCF
4               Plaintiff,         )
                                   ) Las Vegas, Nevada
5    vs.                           ) March 14, 2019
                                   ) 9:11 a.m. - 2:16 p.m.
6    WILLIAM WALLER,               ) Courtroom 6A
                                   )   Jury Trial, Volume IV
7               Defendant.         ) Testimony of William Waller
     _____)   *C E R T I F I E D   C O P Y*

8

9       REPORTER'S **PARTIAL** TRANSCRIPT OF JURY TRIAL, VOLUME IV
                       TESTIMONY OF WILLIAM WALLER
10              BEFORE THE HONORABLE JAMES C. MAHAN
                  UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government: *CHRISTOPHER MAGNANI, ESQ.*
                         *MICHAEL LANDMAN, ESQ.*
14                       *U.S. Department of Justice, Tax Division*
                         *601 D Street NW, Room 7334*
15                       *Washington, DC 20004*

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:      Amber M. McClane, CCR 914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

1    APPEARANCES CONTINUED:

2    For the Defendant:

3        **_LOWELL HARRISON BECRAFT, JR., ESQ._**
         _403C Andrew Jackson Way_
4        _Huntsville, Alabama 35801_
         _(256) 533-2535_

5

6    Also Present:

7        _Special Agent Brian Peng, FBI_

8        _Sandra Burgess, Paralegal, DOJ_

9

10                          * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:18-cr-00112-JCM-VCF - March 14, 2019

1                           *I N D E X*

2    Defense's Witnesses:                                    Page

3    **WILLIAM WALLER**

4        *Cont. Direct Examination by Mr. Becraft          5*

5        *Cross-Examination by Mr. Magnani                 75*

6        *Redirect Examination by Mr. Becraft             162*

7        *Recross-Examination by Mr. Magnani              170*

8

9                          * * * * *

10

11                      *E X H I B I T S*

12   | EXHIBIT NO.: | OFFERED | RECEIVED | REJECTED |
     |-------------|---------|----------|----------|
13   | 1   | 43  | 44  |     |
14   | 156 | 47  | 47  |     |
15   | 176 | 58  | 58  |     |
16   | 195 | 107 | 107 |     |
17   | 513 | 7   |     | 7   |
18   | 514 | 11  |     | 11  |
19   | 517 | 16  |     | 17  |
20   | 518 | 19  | 20  |     |
21   | 519 | 22  | 22  |     |
22   | 520 | 23  | 23  |     |
23   | 521 | 24  | 24  |     |
24   | 522 | 25  | 25  |     |
25   | 523 | 26  | 26  |     |

```
 1                     I N D E X   C O N T.

 2                       E X H I B I T S

 3      EXHIBIT NO.:          OFFERED          RECEIVED     REJECTED

 4      524                     27               28

 5      525                     28               28

 6      526                     30               30

 7      527                     32               32

 8      528                     34               34

 9

10                          *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

WILLIAM WALLER - CONT. DIRECT

1        LAS VEGAS, NEVADA; THURSDAY, MARCH 14, 2019; 9:11 A.M.

2                          --o0o---

3                  P R O C E E D I N G S

4        (Jury in at 9:11 a.m.)

5            **COURTROOM ADMINISTRATOR:**  All rise.  United States

6    District Court for the District of Nevada is now in session.

7    The Honorable James C. Mahan presiding.

8            **THE COURT:**  Thank you.  You may be seated.

9            Do the parties stipulate to the presence of the jury

10   and the alternates?

11           **MR. MAGNANI:**  Yes, Your Honor.

12           **MR. BECRAFT:**  We do, Your Honor.

13           **THE COURT:**  All right.  I remind you, sir, you're

14   still under oath.

15           **THE DEFENDANT:**  Yes, sir.

16           **THE COURT:**  You may resume your examination.

17           **MR. BECRAFT:**  May it please the Court.

18           **THE COURT:**  How much longer are you going to be with

19   this witness?

20           **MR. BECRAFT:**  I anticipate maybe 45 minutes to an

21   hour more of direct, Your Honor.

22           **THE COURT:**  All right.

23                  **CONTINUED DIRECT EXAMINATION**

24   BY MR. BECRAFT:

25   Q.   Good morning, Mr. Waller.

WILLIAM WALLER - CONT. DIRECT

1   A.   Good morning.

2   Q.   The last subject of inquiry we left off yesterday was

3   where you were attending a meeting in California and you met

4   Mr. Banister for the first time.  So let's start there; okay?

5   A.   Okay.

6   Q.   Had you had any conversations with Mr. Banister before

7   that time?

8   A.   Not -- no, not before I met him.

9   Q.   Had you seen any videos of Mr. Banister?

10  A.   Yeah.  I saw his video that he had -- at We the People in

11  regards to the tax symposiums in Washington, DC.

12  Q.   Prior to this meeting with him in person, how much time

13  before that had you watched that video?

14  A.   I watched it over and over probably four or five times.

15  Q.   My question was:  How many years or months before you met

16  him personally did you watch that video?

17  A.   It was actually about the same time.  I ran into Joe at

18  the same time I actually came across his video.

19  Q.   Okay.  And after you watched your -- the video, can you

20  relate to us what you learned from watching it?

21  A.   He was just reiterating what I had already heard, that

22  there was no liability for the income tax, and that it was

23  basically collected under voluntary provisions.  And it was

24  the same stuff that I had heard from Irwin.

25  Q.   Were -- what, if any, impression did Mr. Banister make

WILLIAM WALLER - CONT. DIRECT

1   with you when you watched that video?

2   A.    It just solidified my beliefs that there is no law that

3   makes me liable for the tax, that it is collected under

4   voluntary compliance, and it was just -- that was my belief

5   structure, and he was just -- he fortified it.

6          **MR. BECRAFT:**  Just for the record, Your Honor, I'd

7   move for the admission of a clip.  It's proposed

8   Defense Exhibit 513, which we probably already discussed.

9       *(Defense Exhibit No. 513, offered.)*

10          **MR. MAGNANI:**  And that's objected to on 403 grounds

11   pursuant to the motion we filed.

12          **THE COURT:**  What's Exhibit 513?

13          **MR. BECRAFT:**  It was a -- about a less than

14   ten-minute video clip of Mr. Banister --

15          **THE COURT:**  All right.

16          **MR. BECRAFT:**  -- the one he was referring to.

17          **THE COURT:**  So I'm not going to admit that, no.

18       *(Defense Exhibit No. 513, rejected.)*

19          **MR. BECRAFT:**  Okay.  Yeah.

20          **THE COURT:**  That's -- you know, I thought we dealt

21   with that already.

22   **BY MR. BECRAFT:**

23   Q.    Now, when you met --

24          **THE COURT:**  I sustain the objection based on 403.

25          **MR. BECRAFT:**  Understood, Judge.

WILLIAM WALLER - CONT. DIRECT

1          **THE COURT:**  That the prejudicial effect outweighs the

2     probative value.

3          Go ahead.

4     **BY MR. BECRAFT:**

5     Q.   Now, when you met with him in person, how long did you

6     talk to him?

7     A.   Maybe 10 or 15 minutes.

8     Q.   And the type of meeting that you attended was similar in

9     nature?

10    A.   Yes.

11    Q.   Other people talking about taxes?

12    A.   Yes, it was.

13    Q.   Okay.  And the points that you -- let me rephrase that

14    question.

15         Did Mr. Banister tell you that you should file

16    returns?

17    A.   No.  He didn't say that.  He would not recommend that.

18    But that's why the video was important to me because it's --

19    his whole video is not even more than 10 or 15 minutes, but

20    the very fact that he could surmise or cover more of what he

21    was talking about than I could.  The truth is that -- what he

22    covered in the video is -- just like I said, he goes over in

23    depth that there is no law that makes you liable for the tax.

24    I mean, that's really what this is all about.

25         **THE COURT:**  All right.  He can testify as to his

WILLIAM WALLER - CONT. DIRECT

```
 1    state of mind.
 2              MR. BECRAFT:  I'm doing that here, Judge.
 3    BY MR. BECRAFT:
 4    Q.   Now, I believe you mentioned yesterday that there was a
 5    man by the name of John Turner you had encountered in the
 6    past.  Am I correct?
 7    A.   Correct, correct.
 8    Q.   What were the circumstances under which you first learned
 9    of the existence of John Turner?
10    A.   He was at the same conference, the Tax Symposiums.  He
11    was another IRS agent that was forced with, you know, either
12    to uphold the constitution or basically to resign from his
13    position because he, too --
14              THE COURT:  Okay.  Listen to his question, and answer
15    his question.
16              THE DEFENDANT:  Okay.
17              MR. BECRAFT:  Let me rephrase it.
18    BY MR. BECRAFT:
19    Q.   Give us the year in which you first learned about a man
20    named John Turner.
21    A.   I'm going to say 2001.
22    Q.   All right.  And how did you learn about John Turner?
23    A.   Through We the People.
24    Q.   And what is it that you learned about John Turner through
25    We the People?
```

WILLIAM WALLER - CONT. DIRECT

1    A.   He was an ex-IRS agent that had resigned his position

2    based on the fact that he could no longer uphold the

3    constitution because of his beliefs that there is no law that

4    requires anybody to pay the income tax.

5    Q.   Okay.  Was there ever any video that you watched

6    regarding Mr. Turner?

7    A.   Yes.  There's another video that I wanted to get

8    admitted.

9    Q.   Okay.  Listen to my questions.

10        When did you watch a video of John Turner?

11   A.   He was on the same C-SPAN.

12   Q.   Listen to my question.

13        **THE COURT:**  The question was when.

14        **THE DEFENDANT:**  Oh.  Same year.  I'm sorry.  2001.

15   **BY MR. BECRAFT:**

16   Q.   Okay.  And when you watched the video of Mr. John Turner

17   giving a presentation at a meeting?

18   A.   It was -- it was the We the People.  It was a conference.

19   There was other speakers:  Bill Conklin, Bill Benson,

20   Joe Banister, John Turner.

21        **THE COURT:**  So the answer is "yes"?

22        **THE DEFENDANT:**  Yes.

23   **BY MR. BECRAFT:**

24   Q.   And was there anything in the video that you watched of

25   Mr. John Turner that told you that you were required to file

WILLIAM WALLER - CONT. DIRECT

1    income tax returns?

2    A.    No.

3    Q.    And was the information that was related to on that video

4    by Mr. John Turner the opposite of that?

5           THE COURT:  He's testified to that already.

6           MR. BECRAFT:  Your Honor, move for the --

7    BY MR. BECRAFT:

8    Q.    The video, did it have an impression upon you?

9    A.    Yeah, a huge impression.

10   Q.    Okay.  Did you rely upon the video?

11   A.    Yes, I did.

12          MR. BECRAFT:  Your Honor, I'd move for the admission

13   of Defense Exhibit 514.

14      (Defense Exhibit No. 514, offered.)

15          MR. MAGNANI:  Same objection.

16          THE COURT:  The video?  No.

17          MR. BECRAFT:  Yeah.

18          THE COURT:  No.

19          MR. BECRAFT:  Just making a record.

20          THE COURT:  I told you I'm not going to allow that.

21   That's like hearsay.

22      (Defense Exhibit No. 514, rejected.)

23          MR. BECRAFT:  Okay.  I was offering it for state of

24   mind.

25          THE COURT:  For --

WILLIAM WALLER - CONT. DIRECT

1      **MR. BECRAFT:**  I was offering --

2      **THE COURT:**  -- state of mind?

3      **MR. BECRAFT:**  Yeah.  Both videos for state of mind,

4  Judge.

5      **MR. MAGNANI:**  And it's the same 403 objection,

6  Your Honor.

7      **THE COURT:**  And it is.  The prejudicial effect

8  outweighs the probative value.

9      **MR. BECRAFT:**  Okay.

10  BY MR. BECRAFT:

11  Q.   Now, by the year 2001, you had already watched some

12  videos of John Turner and Joe Banister.  2001 rolls around,

13  December 31st of 2001.  What was your belief about the

14  requirement to file income tax returns?

15  A.   That there was no law requiring me to file or pay the

16  income tax.

17  Q.   How were you working in 2001?

18  A.   How was I working?

19  Q.   Yes.

20  A.   Selling real estate.

21  Q.   Making money?

22  A.   Yes.

23  Q.   Being paid?

24  A.   Yes.

25  Q.   And did the representations made to you on those videos

WILLIAM WALLER - CONT. DIRECT

1    by John Turner and Joe Banister have an effect upon your

2    decision regarding not filing a return for 2001?

3    A.   Yes.  I was already a non-filer, but they just -- coming

4    across them just fortified my beliefs.

5    Q.   Okay.  Were there any other parties that you learned

6    about by watching -- let me back that up.

7         These videos that you've talked about, how many were

8    there?

9    A.   Well, there was -- there was quite a few videos, but

10    those were the only two in mention.

11    Q.   Okay.  Do you -- did you ever watch a video or see a

12    presentation by a lady by the name of Victoria Osborn?

13    A.   Yes.

14    Q.   And what did you come to understand who the video -- or

15    Victoria Osborn was?

16    A.   She is a forensic accountant, and she was also at We the

17    People.  And she had the recommendation to have my master file

18    pulled and have it decoded.

19    Q.   Had you ever heard of a master file before this lady

20    mentioned it to you?

21    A.   Yes, I had heard of it, but I didn't really know what it

22    was.

23    Q.   Okay.  After you had this -- or after you saw something

24    regarding Victoria Osborn, what was your conclusion about this

25    computer data?

WILLIAM WALLER - CONT. DIRECT

1   A.   Well, the first thing I did was I sent in a Freedom --

2   Q.   No.  Listen to my question.  Did you come to an

3   understanding that the IRS had computer data on you?

4   A.   Yes.

5   Q.   And what did you think -- what were you told what might

6   be in that computer data?

7   A.   I was told it was a bunch of cryptic code that no one can

8   really understand, and that you should probably get it

9   requested and have it decoded so you know what they have on

10  you.

11  Q.   Did you ever have any opportunity to see some videos of

12  the commissioner of Internal Revenue?

13  A.   Yes.

14  Q.   And when was that?

15  A.   It was in the same time frame, 2000/2001.

16  Q.   And from whom did you get a video regarding the

17  commissioner of Internal Revenue?

18  A.   I believe that was off of YouTube.

19  Q.   And when was it you were watching this video?

20  A.   When was it?

21  Q.   The commissioner, yes.

22  A.   The same time frame.

23  Q.   And relate to us what you learned by watching a video of

24  the commissioner of Internal Revenue.

25  A.   He was asked a question by David K. Johnson.  It was at

WILLIAM WALLER - CONT. DIRECT

1    the tax hearings, and they had asked him -- there's a bunch of

2    people outside wanting to know what law makes them liable for

3    the tax, and his answer was, "Well, I paid my taxes ever since

4    I was a young man and, you know, it's -- it's a construct of

5    the American way."  He never answered the question.  He was

6    asked what law makes them liable.

7    Q.   And were there any other parties that was on that video

8    clip?

9    A.   Yeah.  His spokesperson.

10   Q.   And who is his spokesperson?

11   A.   I don't remember her name, but she was asked the same

12   question.  And her response was pretty much along the same

13   lines, that -- as a matter of fact, just go to IRS.gov and

14   you'll find out all the information there.  She didn't address

15   the issue of the liability issue.

16   Q.   Is that video that you watched of the commissioner of

17   Internal Revenue and this other lady, is that something that

18   you relied upon?

19   A.   Yes.

20        **MR. BECRAFT:**  Your Honor --

21   **BY MR. BECRAFT:**

22   Q.   Did it have an impact upon your beliefs about whether or

23   not you were required to file income tax returns?

24        **THE COURT:**  Don't ask --

25        **THE DEFENDANT:**  Yes.

WILLIAM WALLER - CONT. DIRECT

1      **THE COURT:**  -- him leading questions.  Let him

2  testify instead of --

3      **MR. BECRAFT:**  Okay.

4      **THE COURT:**  -- having you testify.  I mean, it's --

5  you know --

6      **MR. BECRAFT:**  Okay, Judge.

7      **THE COURT:**  It's direct examination; right?

8      **MR. BECRAFT:**  Yes, it is, Your Honor.

9      **THE COURT:**  No cross -- no leading questions; right?

10      **MR. BECRAFT:**  Yes, Your Honor.

11  BY MR. BECRAFT:

12  Q.   What, if any, impact did it have upon your decisions to

13  file income tax returns?  Or the video had what impact upon

14  you in filing -- making the decision as to whether or not you

15  should file income tax returns?

16  A.   Well, it was the -- the IRS commissioner basically

17  dodging the question of what law made them liable, and it just

18  fortified my position that we're still not getting an answer

19  to that very question.

20      **MR. BECRAFT:**  Your Honor, I'd move for the admission

21  of a video clip.  It's Defense Exhibit 517.

22      *(Defense Exhibit No. 517, offered.)*

23      **MR. MAGNANI:**  Same objection, Your Honor.

24      **THE COURT:**  And the same ruling.  I think the

25  prejudicial effect outweighs the probative value.

WILLIAM WALLER - CONT. DIRECT

1         *(Defense Exhibit No. 517, rejected.)*

2    **BY MR. BECRAFT:**

3    Q.    Victoria Osborn told you to get information from the IRS?

4    A.    Correct.

5    Q.    Identify what information she requested you to get or

6    directed you to get.

7              **THE COURT:**  She didn't request him to get anything.

8              **MR. BECRAFT:**  Okay.

9    **BY MR. BECRAFT:**

10   Q.    In response to the information that you learned from

11   Victoria Osborn, what, if anything, did you do?

12   A.    I sent in a Freedom of Information Act for my master

13   file.

14   Q.    And can you explain to the jury what you understand the

15   Freedom of Information Act request is.

16   A.    It's a request that you can send in to get data like

17   that, and they will send it to you.  But in my case, I

18   actually had them transcribe --

19             **THE COURT:**  Answer the question.  Next question.

20             **MR. BECRAFT:**  All right.

21   **BY MR. BECRAFT:**

22   Q.    Did you make a Freedom of Information Act request to the

23   IRS?

24             **THE COURT:**  He just said he did.

25             **MR. BECRAFT:**  Okay.

WILLIAM WALLER - CONT. DIRECT

1  **BY MR. BECRAFT:**

2  Q.   And give us the time frame that you recall that you made

3  this request.

4  A.   It was for years 1998 through 2008.

5  Q.   Okay.  I'm asking for the time frame that you submitted

6  to the IRS the request to get that computer data.  When was

7  that?

8  A.   Well, I had -- I did it on two different occasions.  One

9  was in '05 and another one was in '12, I believe.

10  Q.   Okay.

11        **MR. BECRAFT:**  Can we -- I'm sorry, Judge.  I didn't

12  turn on the ELMO.

13  **BY MR. BECRAFT:**

14  Q.   I'm going to show to you some exhibits.  Did you receive

15  some -- in response to that FOIA request, did you receive some

16  documents from the IRS?

17  A.   Yes, I did.

18  Q.   And can you describe what those documents were.

19  A.   It was my master file with, like I said, codes on it, but

20  then there was also the translation on another page where I

21  had asked the IRS to explain what the codes meant.

22        **MR. BECRAFT:**  For the benefit of the witness only.

23  **BY MR. BECRAFT:**

24  Q.   Do you see this document that's on the screen?

25  A.   Yes, I do.

WILLIAM WALLER - CONT. DIRECT

```
 1    Q.   And does it have a date?

 2    A.   Yes.

 3    Q.   And what is that date?

 4         THE COURT:  Well, it speaks for itself.

 5         MR. BECRAFT:  Okay.

 6   BY MR. BECRAFT:

 7    Q.   What's the exhibit sticker down there at the bottom?

 8         THE COURT:  518.

 9         THE DEFENDANT:  518.

10   BY MR. BECRAFT:

11    Q.   And is this what -- this came in response to your request

12    to the IRS to provide this document?

13    A.   Yes.  That's one of them.

14    Q.   All right.  And this exhibit has a second page to it.

15    A.   Correct.

16    Q.   All right.  Is this something that you relied upon in

17    making your decision as to whether or not you were required to

18    file income tax returns?

19    A.   Very much.

20         THE COURT:  That's a leading question again.

21         MR. BECRAFT:  Your Honor, I'd move for the admission

22    of proposed Defense Exhibit 518.

23         (Defense Exhibit No. 518, offered.)

24         MR. MAGNANI:  No objection.

25         THE COURT:  Thank you.  Exhibit 518 may be admitted
```

WILLIAM WALLER - CONT. DIRECT

1    and published to the jury.

2        (Defense Exhibit No. 518, received.)

3    **BY MR. BECRAFT:**

4    Q.   Now, Mr. Waller, I have here on the screen Exhibit 518,

5    the first page.  Does it relate to you?

6    A.   Yes, it does.

7    Q.   And how do you know that?

8    A.   It has my name on it.

9    Q.   It has your address?

10   A.   Yes.

11   Q.   What was important to you?  Can you point out, identify

12   for us, tell us, this document has that was something of

13   significance to you.

14   A.   Towards the middle column under where it says, "Prior

15   Name Control," it says, "MFR-01."

16   Q.   Okay.  What --

17   A.   Right.

18   Q.   Is my pen --

19   A.   Right there.  That's it.

20   Q.   Okay.  Now, it has a date on it up here where my pen is.

21   A.   Correct.

22   Q.   Would it be fair to say that sometime after that you

23   received this document?

24   A.   Yeah, about that time.

25   Q.   All right.  The second page of this exhibit, can you

WILLIAM WALLER - CONT. DIRECT

1   point out what was important.

2   A.   Right there at the bottom where it says MFR-01, the IRS

3   decrypted it for me, and it says, "Mail File Requirement" --

4            THE COURT:   Where are you reading?  Are you reading

5   from the exhibit?

6            THE DEFENDANT:   Yes, sir.

7   BY MR. BECRAFT:

8   Q.   Is my pen pointed in the right place?

9   A.   Yes.

10            THE COURT:   Okay.  So the jury can follow along.

11            Go ahead.

12            THE DEFENDANT:   It says, "Mail File Requirement:

13   01= Return not required to be mailed or filed."  And then it

14   in parentheses it says, "1040 not required."

15   BY MR. BECRAFT:

16   Q.   Now, the year that this related to, was it this year?

17   A.   Yes.

18   Q.   That was one of the years that was contained in your

19   Freedom of Information Act request, 1998?

20   A.   Yeah, it was the first year.

21   Q.   Did you ask for other years?

22   A.   Yeah.  From 1998 to 2008.

23            MR. BECRAFT:   For the benefit of the witness only.

24   BY MR. BECRAFT:

25   Q.   Is this another page that was mailed to you in response

WILLIAM WALLER - CONT. DIRECT

1    to your Freedom of Information Act request?

2    A.    Yes.

3    Q.    Proposed Exhibit 519; right?

4    A.    Yes.  I'm sorry.

5    Q.    Is this another similar document?

6    A.    Yeah, it's similar.  It's just a different year.

7          **MR. BECRAFT:**  Okay.  Your Honor, I'd move for the

8    admission of 519.

9         (Defense Exhibit No. 519, offered.)

10         **MR. MAGNANI:**  No objection.

11         **THE COURT:**  Thank you.  Exhibit 519 may be admitted

12   and published -- will be admitted and may be published.

13        (Defense Exhibit No. 519, received.)

14         **MR. BECRAFT:**  Yes, Your Honor.

15   **BY MR. BECRAFT:**

16   Q.    Now, Exhibit No. 519 relates to what year?

17   A.    1999.

18   Q.    And can you point out on the screen for us what you found

19   significant on this page.

20   A.    It's the same middle column, right under "Prior Name

21   Control," the "MFR-01."

22   Q.    Is that where my pen is pointed?

23   A.    That's right.

24   Q.    Page 2 of this exhibit, can you point out what was

25   important for you on the second page?

WILLIAM WALLER - CONT. DIRECT

1    A.    Yep.  It's at the bottom.  It was the decoding.  "MFR 01,

2    Mail File Requirement."  Again, "01= Return not required to be

3    mailed or filed.  (1040 not required.)"

4    Q.    And the date of this document, was it the same as the

5    others?

6    A.    Yes.

7    Q.    In the same package --

8          **MR. BECRAFT:**  For the benefit of the witness only.

9    **BY MR. BECRAFT:**

10   Q.    -- did you receive this?

11   A.    Yes.  2000.

12   Q.    Exhibit No. 520?

13   A.    Yes.

14   Q.    Is this something you relied upon as well?

15   A.    Absolutely.

16         **MR. BECRAFT:**  Your Honor, I'd move for the admission

17   of 520.

18         *(Defense Exhibit No. 520, offered.)*

19         **MR. MAGNANI:**  No objection.

20         **THE COURT:**  Exhibit 520 will be admitted and may be

21   published.

22         *(Defense Exhibit No. 520, received.)*

23   **BY MR. BECRAFT:**

24   Q.    On the first page of Exhibit No. 520, can you tell me

25   where to point my pen of whatever was significant on this

WILLIAM WALLER - CONT. DIRECT

1    page?

2    A.    Again, the MFR requirement under "Prior Name Control."

3    Q.    Okay.  Is my pen pointed in the right direction?

4    A.    Yeah.  "MFR-01."

5    Q.    Turning to page 2 of Exhibit 520, am I in the right spot?

6    Is my pen pointed in the right place?

7    A.    That's it.

8    Q.    What was significant on the second page of this exhibit,

9    can you tell the jury?

10   A.    Yes.  The same decoding for that requirement, MFR-01,

11   "= Return not required to be mailed or filed.  (1040 not

12   required.)"

13          **MR. BECRAFT:**  For the witness only, I have 521 on the

14   screen.

15   **BY MR. BECRAFT:**

16   Q.    Was this in the same package?

17   A.    Yes.

18   Q.    Is this something you relied upon?

19   A.    Yes.

20          **MR. BECRAFT:**  Your Honor, I'd move for the admission

21   of 521.

22        (Defense Exhibit No. 521, offered.)

23          **MR. MAGNANI:**  No objection.

24          **THE COURT:**  521 may be admitted.

25        (Defense Exhibit No. 521, received.)

WILLIAM WALLER - CONT. DIRECT

1    **BY MR. BECRAFT:**

2    Q.   Can you point out on the first page of 521 what is

3    significant?  Is my pen pointed in the right place?

4    A.   Yes, that's right.

5    Q.   And what -- my pen is pointed to what?

6    A.   The MFR code 01.

7    Q.   Moving to the second page of this exhibit, is my pen

8    pointed in the right place?

9    A.   Yes.

10   Q.   And what does it say?

11   A.   "Mail File Requirement:  01= Return not required to be

12   mailed or filed.  (1040 not required.)"

13          **MR. BECRAFT:**  For the benefit of the witness only.

14   **BY MR. BECRAFT:**

15   Q.   Showing to you 522.  Was this in the same package?

16   A.   Yes.

17          **MR. BECRAFT:**  Your Honor, I'd move for the admission

18   of 522.

19       *(Defense Exhibit No. 522, offered.)*

20          **MR. MAGNANI:**  No objection.

21          **THE COURT:**  Thank you.  The same may be admitted --

22   will be admitted and may be published.

23       *(Defense Exhibit No. 522, received.)*

24   **BY MR. BECRAFT:**

25   Q.   Is my pen pointed in the right place?

WILLIAM WALLER - CONT. DIRECT

1    A.   Yes.  "MFR-01."

2    Q.   On the first page of Exhibit 522, what year does this

3    relate to?  Can you point out on the screen?

4    A.   2002 in the upper-right.

5    Q.   Is my pen pointed in the right place?

6    A.   Yes.

7    Q.   Okay.  So for 2002 you saw this MFR-01.  And on the

8    second page of this exhibit, is my pen pointed in the right

9    place?

10   A.   Yes.

11   Q.   And is -- can you read it for us, please.

12   A.   Yep.  "Mail File Requirement."  Again, "01= Return not

13   required to be mailed or filed.  (1040 not required.)"

14   Q.   In the same package, did you get what --

15        **MR. BECRAFT:**  For the witness only, Exhibit 523.

16   **BY MR. BECRAFT:**

17   Q.   You got Exhibit 523 in the same package?

18   A.   Yes.

19        **MR. BECRAFT:**  Your Honor, I'd move for the admission

20   of 523.

21        *(Defense Exhibit No. 523, offered.)*

22        **MR. MAGNANI:**  No objection.

23        **THE COURT:**  Thank you.  The same will be admitted and

24   may be published.

25        *(Defense Exhibit No. 523, received.)*

WILLIAM WALLER - CONT. DIRECT

1    **BY MR. BECRAFT:**

2    Q.   See where my pen is?

3    A.   Yes.

4    Q.   What year does this exhibit relate to?

5    A.   2003.

6    Q.   And is my pen pointed in the right place for what you

7    found significant?

8    A.   Yes.  "MFR-01" again.

9    Q.   And pointing to the second page where there was an

10   explanation of that computer code, is my pen in the right

11   place?

12   A.   Yes.

13   Q.   And can you read to the jury what it is.

14   A.   "MFR 01," that was the code on the front, "Mail File

15   Requirement:  01= Return is not required to be mailed or

16   filed.  (1040 not required.)"

17         **MR. BECRAFT:**  For the benefit of the witness only.

18   **BY MR. BECRAFT:**

19   Q.   Do you see Exhibit 524 on the screen?

20   A.   Yes.

21         **MR. BECRAFT:**  Your Honor, I'd move for the admission

22   of 524.

23       *(Defense Exhibit No. 524, offered.)*

24         **MR. MAGNANI:**  No objection.

25         **THE COURT:**  All right.  524 will be admitted and may

WILLIAM WALLER - CONT. DIRECT

1    be published.

2         *(Defense Exhibit No. 524, received.)*

3    **BY MR. BECRAFT:**

4    Q.   Is my pen pointed in the right place?

5    A.   Yes, 2004.

6    Q.   This computer data relates to the year 2004?

7    A.   Yes.

8    Q.   All right.  Is my pen pointed in the right place here?

9    A.   Yes, "MFR-01."

10   Q.   And turning to the second page of this exhibit, is my pen

11   pointed in the right place?

12   A.   Yes.  "MFR 01, Mail File Requirement:  01= Return not

13   required to be mailed or filed.  (1040 not required.)"

14   Q.   Did you receive similar information regarding the year

15   2005 --

16   A.   Yes.

17   Q.   -- in that package?

18        **MR. BECRAFT:**  Your Honor, I move for the admission of

19   525.

20        *(Defense Exhibit No. 525, offered.)*

21        **MR. MAGNANI:**  No objection.

22        **THE COURT:**  Thank you.  Exhibit 525 will be admitted

23   and may be published.

24        *(Defense Exhibit No. 525, received.)*

25   *///*

WILLIAM WALLER - CONT. DIRECT

1   BY MR. BECRAFT:

2   Q.   My pen, is it pointed in the right place?

3   A.   Yes.  2005.

4   Q.   So this relates to the year 2005?

5   A.   Yes.

6   Q.   Were you working in the year 2005?

7   A.   Yes.

8   Q.   For whom?

9   A.   Century 21.

10  Q.   At the end of the year, did Century 21 send any tax

11  documents to you?

12  A.   1099, yes.

13  Q.   And what's your understanding as to who also got a copy

14  of that 1099?

15  A.   The IRS.

16  Q.   And when did you receive that 1099 from that real estate

17  agency after the year -- after December 31st of 2005?

18  A.   In the first part of January in 2006.

19  Q.   Okay.  Is it your understanding that your copy and the

20  copy to the IRS is mailed at the same time?

21  A.   Yes.

22  Q.   What's the date on this document that it was printed out,

23  to your understanding?

24  A.   May 16th, 2008.

25  Q.   So for the year 2005, my pen's pointed in the right

WILLIAM WALLER - CONT. DIRECT

1    place, "MFR-01"?

2    A.   Yes, "MFR-01."

3    Q.   And on the second page of this exhibit, is what's shown

4    on the screen and where my pen is pointed, is that in the

5    right place?

6    A.   It is.  MFR 01 equals return not required to be mailed or

7    filed, a 1040 is not required.

8           MR. BECRAFT:  For the benefit of the witness only.

9    BY MR. BECRAFT:

10   Q.   526 is the next exhibit?

11   A.   Yes.

12   Q.   This is what was received at the same time?

13   A.   Yes.

14   Q.   All right.

15          MR. BECRAFT:  Your Honor, I'd move for the admission

16   of 526.

17       (Defense Exhibit No. 526, offered.)

18          MR. MAGNANI:  No objection.

19          THE COURT:  Thank you.  526 will be admitted and may

20   be published.

21       (Defense Exhibit No. 526, received.)

22   BY MR. BECRAFT:

23   Q.   526 relates to what year?

24   A.   2006.

25   Q.   Is my pen pointed in the right place?

WILLIAM WALLER - CONT. DIRECT

1    A.   Yes.

2    Q.   What's the print date?  Is my pen pointed in the right

3    place?

4    A.   5/16/2008.

5    Q.   All right.  Is my pen pointed in the right place for what

6    you found significant on this exhibit?

7    A.   Yes.  "MFR-01."

8    Q.   The second page, is my pen pointed in the right place?

9    A.   Yes.

10   Q.   So for the year 2006, you got this document from the IRS

11   relating to the year 2006, and it was translated into this?

12   A.   Yes.  That the return is not required --

13            THE COURT:  That's all right.  The exhibit speaks for

14   itself.  It's in evidence.

15   BY MR. BECRAFT:

16   Q.   Where were you working in 2006?

17   A.   Century 21.

18   Q.   And after Century -- at the end of the year, what, if

19   anything, did the real estate agency known as Century 21 do in

20   reference to sending you tax information?

21   A.   They sent me and the IRS a 1099 for that year.

22   Q.   Reporting all that you'd been paid that year?

23   A.   Correct.

24   Q.   So what was the time frame in which you would have

25   received that document from that real estate agency?

WILLIAM WALLER - CONT. DIRECT

1    A.    January of the following year.

2              MR. BECRAFT:  For the benefit of the witness only,

3    527.

4    BY MR. BECRAFT:

5    Q.    Is this something you relied upon, too?

6    A.    I don't see anything.  Oh, yeah.

7              MR. BECRAFT:  Your Honor, I'd move for the admission

8    of 527.

9         (Defense Exhibit No. 527, offered.)

10             MR. MAGNANI:  Without objection.

11             THE COURT:  Thank you.  527 will be admitted and may

12   be published.

13        (Defense Exhibit No. 527, received.)

14   BY MR. BECRAFT:

15   Q.    Okay.  Is my pen pointed in the right place for what the

16   print date of this document is?

17   A.    Yes, 5/16/2008.

18   Q.    All right.  Is my pen pointed in the right place for what

19   you found significant on this exhibit?

20   A.    Yes, another MFR code 01.

21   Q.    All right.  Is my pen pointed in the right place for the

22   year that this relates to?

23   A.    Yes, 2007.

24   Q.    All right.  And was there, with this particular document,

25   an explanation of the computer transaction that appeared on

WILLIAM WALLER - CONT. DIRECT

1    this document for the year 2007?

2    A.    I don't believe so.

3    Q.    Okay.  What did you think that this meant, where my pen

4    is pointed, that MFR-01?

5    A.    The same thing that --

6              **THE COURT:**  Well, wait just a second.  What did he

7    think?

8              **MR. BECRAFT:**  Let me rephrase it, Judge.

9    **BY MR. BECRAFT:**

10   Q.    What did you believe?

11   A.    Well, I believe it's the same code for all the other

12   prior years; that no 1040 was required from me.

13   Q.    Now, this relates to the year 2007; is that your

14   understanding?

15   A.    Yes.

16   Q.    Is the print date of this document where my pen is

17   pointed?

18   A.    Yes.

19   Q.    May 18th -- May 16th of 2008?

20   A.    Yes.

21   Q.    Where were you working in 2007?

22   A.    Century 21.

23   Q.    At the end of the year of 2007, did Century 21 mail you

24   any tax information?

25   A.    Yes.

WILLIAM WALLER - CONT. DIRECT

1    Q.   And what was that?

2    A.   1099.

3    Q.   And to your knowledge, did the IRS receive a copy of that

4    1099?

5    A.   Yes.

6         **THE COURT:**  How would he know that?

7         **MR. BECRAFT:**  It's a presumption, Your Honor, not --

8    I'll clarify it.

9    **BY MR. BECRAFT:**

10   Q.   You have -- these questions I've asked about the tax

11   documents that were mailed to you by the companies that you

12   worked for, you only know that you received one, a 1099?

13   A.   Yes.

14   Q.   Do you have any personal knowledge about the IRS

15   receiving a 1099?

16   A.   Not at that time, no.

17   Q.   Okay.

18        **MR. BECRAFT:**  For the benefit of the witness only,

19   Exhibit 528.

20        Your Honor, I'd move for the admission of 528.

21        *(Defense Exhibit No. 528, offered.)*

22        **MR. MAGNANI:**  No objection.

23        **THE COURT:**  Thank you.  Exhibit 528 will be admitted

24   and may be published.

25        *(Defense Exhibit No. 528, received.)*

WILLIAM WALLER - CONT. DIRECT

1    **BY MR. BECRAFT:**

2    Q.    Now, for all of these documents that you received that

3    we've just gone over, the computer data, the FOIA request that

4    you made was before this date on the screen?

5    A.    Yes.

6    Q.    May 16th of 2008?

7    A.    Correct.

8    Q.    And how much time elapsed between when you sent in that

9    FOIA request and you received this package of information?

10   A.    I believe it was a few months.

11   Q.    So your request would have been made in the early part of

12   2008?

13   A.    Yeah, I believe so.  I'm not sure.

14   Q.    But when it was received and you were looking at -- this

15   relates to what years?  Is my pen pointed in the right place?

16   A.    Yes, 2008.

17   Q.    All right.  Is my pen pointed in the right place for the

18   symbol computer -- computer symbol that you found significant?

19   A.    Yes.  "MFR-01."

20   Q.    Was -- for this year, was there any document that was

21   provided that was similar to the earlier years?

22   A.    Just the first page with the code.  It was -- it was too

23   early for the translation because it hadn't been processed yet

24   because of the time of year.

25   Q.    What did you think that this -- where my pen is pointed,

WILLIAM WALLER - CONT. DIRECT

1    "MFR-01," mean?

2    A.   It's the MFR-01 where no return was required to be mailed

3    or filed.

4    Q.   You draw that conclusion from the similar pages for the

5    prior years?

6    A.   Yes.

7    Q.   Where were you working in 2008 -- or -- yeah, 2008?

8    A.   Century 21.

9    Q.   Now, the year 2008 ends, December 31st, 2008.  You had

10   been working for a real estate agency that year.  April 15th

11   of 2009 comes along.  Did you or did you not file a return for

12   2008?

13   A.   I did not.

14   Q.   Can you tell the jury why?

15   A.   Because I still believe that, even with this decoding,

16   that I am not required to file.  I believe that it's still an

17   MFR-01 even to this day, which means I am not required to file

18   a return as the IRS stated in their own documents.

19   Q.   2009, where were you working?

20   A.   Century 21.

21   Q.   Had you, at that time, formed your own independent real

22   estate agency?

23   A.   Not yet, no.

24   Q.   All right.  When did that happen?

25   A.   I believe it was in 2012.

WILLIAM WALLER - CONT. DIRECT

1   Q.   So for 2009, 2010, 2011, you were still working for

2   Century 21?

3   A.   Correct.

4   Q.   And Century 21 was giving you checks?

5   A.   Yes.

6   Q.   At -- to ask a question related to all those years, when

7   April 15th of the -- for each of these, after the year

8   concluded, what did you believe about your requirement to file

9   federal income tax returns?

10  A.   I still believe that I was not required to file.

11  Q.   2011, what were you doing during the year 2011?

12  A.   Selling real estate.

13  Q.   How much time did you devote, during the year 2011, to

14  your work of selling real estate?

15  A.   It was the full year.

16  Q.   A typical week, how much time would you expend working?

17  A.   A typical week is, you know, 30 to 50 hours just

18  depending on the workload.

19  Q.   Would it be fair to say virtually every week during 2011

20  you were working?

21  A.   Correct.

22  Q.   All right.  And at the end of the year, December 31st

23  comes along, sometime thereafter did the company that you were

24  working for, Century 21, in January 2012 send you anything?

25  A.   Another 1099 for that year, previous year.

WILLIAM WALLER - CONT. DIRECT

1    Q.    And did you look at that 1099 when you received it?

2    A.    Of course.

3    Q.    Did it appear to you to be inaccurate?

4    A.    No, it didn't appear to be inaccurate.

5    Q.    Did it fairly represent what the company had paid to you

6    during the year 2011?

7    A.    Yes.

8    Q.    Now, April the 15th of 2012 comes along.  Can you explain

9    to the jury the reasons why you did not file a return for

10   2011?

11   A.    Because I am still under the belief that I was not

12   required to file a 1040.  Even as per the IRS's own paperwork

13   that they sent me, to this day they still have not showed me

14   where I am actually liable to pay income tax.

15   Q.    2012, in early 2012 were you still working for

16   Century 21?

17   A.    Yes.

18   Q.    How long during that year did you work for Century 21?

19   A.    It was a couple of months, two or three months, I

20   believe, before we started on our own.

21   Q.    Okay.  Tell the jury what it is that you started on your

22   own.

23   A.    Platinum Properties.

24   Q.    And Platinum Properties, was that a company?

25   A.    Yeah.  Another real estate office.

WILLIAM WALLER - CONT. DIRECT

1    Q.   And was Platinum Properties an organization that had been

2    created by you, or does it have a different owner, so to

3    speak?

4    A.   Well, Burbank Holdings is the entity.   Burbank Holdings

5    is doing business as Platinum Properties.

6    Q.   Okay.   When was Burbank Holdings created?

7    A.   I believe 2004.

8    Q.   And who created it?

9    A.   I did.

10   Q.   And with what state did you -- under the laws of what

11   state did you create it?

12   A.   It's an LLC in the state of Nevada.

13   Q.   Between the time that you created it on all the -- all

14   the way up until the early part of 2012, what was

15   Burbank Holdings really doing?

16   A.   Burbank Holdings is the entity that -- when in real

17   estate, it's a protection device.   So for -- if you're opening

18   up corporate bank accounts, if you're going to purchase

19   property, if you're going to accept funds from clients, you

20   actually have to have it in a corporate bank account.   You

21   can't have it in your own name; otherwise, it's considered

22   commingling.   So that was the primary function of it.

23   Q.   Okay.   And why would you not do it in your own name?

24   A.   Because the Real Estate Division won't allow you to

25   commingle funds -- other people's funds with your own funds.

WILLIAM WALLER - CONT. DIRECT

1    Q.   Now, did Burbank Holdings have a bank account when it was

2    created in 2004?

3    A.   It -- once the entity was created, it then -- it then got

4    a bank account, yes.

5    Q.   All right.  And after it was created and it opened up a

6    bank account, what was the source of the deposits that were

7    made into that account?

8    A.   Commission checks mainly.

9    Q.   So you were working for real estate agencies at the time?

10   A.   Yes.

11   Q.   And an account existed in the name of Burbank Holdings?

12   A.   Correct.

13   Q.   Were checks being made payable to you or to

14   Burbank Holdings?

15   A.   To Burbank Holdings.

16   Q.   Okay.  And for these -- for these real estate agencies

17   that you were working for, Century 21 and the other one, why

18   were they paying Burbank Holdings rather than you?

19   A.   Because that's the way that it was structured on a W-9.

20   It was -- Burbank Holdings was the withholding agent.

21   Burbank Holdings was the one that had the accounts.  That's

22   why Burbank Holdings came into existence to begin with.

23   Q.   Okay.  And I don't want to ask the same question for all

24   years, but that, that you've just described, your method of

25   operation, did it continue through 2006, 2007, 2010, '11?

WILLIAM WALLER - CONT. DIRECT

1   A.   Yes.  There was a couple of other accounts added just

2   because, when we got into property management, now we're

3   dealing with security deposit, rental checks.  Those can't be

4   commingled with the regular corporate account.  So there was

5   additional accounts.

6   Q.   Okay.  What were the other entities that you created

7   during this period of time besides Burbank Holdings?

8   A.   Burbank Holdings and Burbank Holdings 1.  The other

9   entities, Big Sky REI, was created later.  That was -- that

10  was an LLC that was going to be used for investments in land.

11  And then GB Holdings wasn't even mine.  And then there was

12  another one, My Three Sons.  The two main ones were

13  Burbank Holdings and Burbank Holdings 1.

14  Q.   All right.  But this -- you created an LLC up in

15  Montana --

16  A.   Correct.

17  Q.   -- did you not?

18       And when did that happen?

19  A.   I believe it was early or mid 2000s.

20  Q.   And what was the purpose of creating a Montana LLC if you

21  lived down here in Nevada?

22  A.   It was going -- we were going to be purchasing land up

23  there.  And as a matter of fact, that LLC never got used for

24  anything; no land, no bank accounts, nothing.

25  Q.   Now, between -- in the early 2000s or out through, you

WILLIAM WALLER - CONT. DIRECT

1   know, 2000 through 2010, were you and your dad contemplating

2   working together in real estate?

3   A.    Yeah.   That was actually the creation of

4   Burbank Holdings 1.   That was -- the only reason that one came

5   to be is because we were going to do remodeling of homes and

6   foreclosures, just like we were doing in Pennsylvania, and we

7   were -- it was going to be held in that entity, which was

8   going to be separate from the Burbank Holdings corporate

9   account.

10  Q.    Did you and your dad ever do anything like that?

11  A.    No.   That LLC actually expired.   We never -- we had

12  offers in on a few properties, but they never went through and

13  we never picked it up.

14  Q.    Have you ever received documents known as notices of

15  deficiency from the Internal Revenue Service?

16  A.    I have.

17  Q.    And the first one you received related to what years?

18  A.    The very first one, I believe, was in regards to the 1998

19  filing.

20          **MR. BECRAFT:**   Could the witness be shown government

21  exhibit -- we'll probably have to transition.   I've got a

22  series of...

23          Could the witness be shown Government Exhibit 1?

24  **BY MR. BECRAFT:**

25  Q.    Mr. Waller, this exhibit has been previously admitted

WILLIAM WALLER - CONT. DIRECT

1    into evidence.  Can you tell us what year it relates to?

2            **MR. MAGNANI:**  Just I don't believe it's in evidence,

3    actually.

4            **THE COURT:**  I don't think it has been --

5            **MR. MAGNANI:**  Do you want to move it in?

6            **MR. BECRAFT:**  Well, it's probably going to come in --

7    may as well, Judge.  Yeah, I move for 1 to be admitted.

8        *(Government Exhibit No. 1, offered.)*

9            **MR. MAGNANI:**  If I could just take a second to look

10   at it.

11           **THE COURT:**  I can't hear what you're saying.  You

12   need to be by the microphone.

13           **MR. BECRAFT:**  I thought it was, but now he -- he's

14   probably got better notes that I have, Judge.

15           **THE COURT:**  Nick, do you have it down as being

16   admitted?

17           **COURTROOM ADMINISTRATOR:**  I do not, Your Honor.

18           **MR. BECRAFT:**  Okay.  Well, to move on, Judge.  If

19   they want to do it on cross, I'll move on, Judge.

20           **THE COURT:**  I don't know that they do.  Do you want

21   the exhibit admitted or not?

22           **MR. MAGNANI:**  I mean, we don't.  We just want to

23   see --

24           **THE COURT:**  I'm not talking to you.  I'm talking to

25   Mr. Becraft.

WILLIAM WALLER - CONT. DIRECT

1          **MR. BECRAFT:**  It's their exhibit.  It's --

2          **THE COURT:**  I understand.  You want it admitted?

3          **MR. BECRAFT:**  Yes, Your Honor.

4          **MR. MAGNANI:**  Without objection.

5          **THE COURT:**  No objection?

6          **MR. MAGNANI:**  No objection.

7          **THE COURT:**  All right.  Then Exhibit 1 will be

8   admitted.

9          *(Government Exhibit No. 1, received.)*

10  **BY MR. BECRAFT:**

11  Q.   Mr. Waller, what's the date of this document?

12  A.   June 7 --

13         **THE COURT:**  The exhibit speaks for itself.

14         **MR. BECRAFT:**  Well, he's testified that he received a

15  notice of deficiency for 2003, and I'm asking if he can tell

16  us about when it was that he received it, which would be

17  indicated by the exhibit.

18         **THE DEFENDANT:**  June 7th, 2005.

19         **MR. BECRAFT:**  Can the witness be shown -- I think

20  this is only a three-page document.  Can the witness be shown

21  the remaining two pages?

22         **THE COURT:**  Well, the exhibit itself is admitted.  So

23  all of the -- it can be shown to everybody.

24  **BY MR. BECRAFT:**

25  Q.   Now, what -- when you received this, were you trained or

WILLIAM WALLER - CONT. DIRECT

1   had you done any studying in what to do when you received a

2   notice of deficiency from the IRS?

3   A.   Had I had any training on what to do with it?

4   Q.   Well, had you studied the issue, what you should do when

5   you receive a document like this?

6   A.   Well, I actually requested a collection due process

7   hearing in regards to receiving the notice.

8   Q.   And generally what happened?  Shortly after you received

9   this, you said you asked for a CDP hearing.  What happened

10  when you did that?

11  A.   The CDP hearing was requested, and I'm not sure if this

12  is the one that I'd actually -- I've only ever had one CDP

13  hearing over the last 20 years, but I have requested at least

14  five.  And if this is in regards to the 1998 -- I can't tell

15  if this is --

16          THE COURT:  Listen to his question, and answer his

17  question.

18          MR. BECRAFT:  Well, okay.  I can do -- move on.

19          Can the witness be shown --

20          THE COURT:  Well, your question was what did you --

21  what happened then?  What happened next?

22          MR. BECRAFT:  Can the witness be shown

23  Government Exhibit 156?

24          THE COURT:  You want to just skip this?

25          MR. BECRAFT:  We've already admitted that --

WILLIAM WALLER - CONT. DIRECT

1          THE COURT:  156 -- 156 --

2          MR. BECRAFT:  -- exhibit.  Now moving on to the next

3   exhibit --

4          THE COURT:  That's fine.  Exhibit --

5          MR. BECRAFT:  -- that happens to be --

6          THE COURT:  -- 156.

7          MR. BECRAFT:  -- one of the government's exhibits.

8          THE COURT REPORTER:  One at a time, please.

9          MR. BECRAFT:  Oh.

10          THE COURT:  You know, when you talk over me, do you

11   know which one of us she takes down?

12          MR. BECRAFT:  I'm --

13          THE COURT:  Yeah, she takes me down.

14          MR. BECRAFT:  It's a common experience.

15          THE COURT:  All right.  156?  Is this admitted, Nick?

16          COURTROOM ADMINISTRATOR:  No, Your Honor.

17          MR. BECRAFT:  Oh.  Then just show it to the witness.

18   BY MR. BECRAFT:

19   Q.   You just mentioned that, in response to the year 2003,

20   you made a request of the IRS.

21   A.   Correct.

22   Q.   Is that this document on the screen?

23   A.   Yes.

24   Q.   The date is what?

25   A.   August 22nd, 2007.

WILLIAM WALLER - CONT. DIRECT

1          **MR. BECRAFT:**  Your Honor, I'd move for the admission

2      of Government Exhibit 156.

3          *(Government Exhibit No. 156, offered.)*

4          **MR. MAGNANI:**  No objection.

5          **THE COURT:**  Thank you.  Exhibit 156 will be admitted

6      and may be published.

7          *(Government Exhibit No. 156, received.)*

8          **MR. BECRAFT:**  Thank you.

9      **BY MR. BECRAFT:**

10     Q.   Now, can you kind of tell us what it is you're trying to

11     accomplish by means of this letter that you sent to the IRS?

12     A.   Yes.  I was requesting a hearing in regards to the final

13     notice of intent to levy for the year 2003.

14     Q.   What was your understanding about your exercise of the

15     right to get a collection due process hearing?  What did you

16     know about collection due process hearings --

17     A.   Well --

18     Q.   -- when you sent this letter?

19     A.   -- the hearing was a chance for me to sit with the

20     appeals officer and challenge the underlying tax liability.

21     For that year as well I wasn't required to file, but yet I had

22     been assessed.  And there was a list of items I wanted to have

23     at the hearing, and I don't believe I actually -- I don't

24     think I actually got that hearing.

25     Q.   Okay.

WILLIAM WALLER - CONT. DIRECT

1           **MR. BECRAFT:**  You can take it off the screen.

2           Can the witness be shown -- this one's been admitted

3   into evidence -- Government's Exhibit 3.  Can we see the

4   second page?

5   **BY MR. BECRAFT:**

6   Q.   Mr. Waller --

7   A.   Yes.

8   Q.   -- this is an exhibit that's been admitted into evidence.

9   A.   Right.

10  Q.   What is your understanding as to the years that it

11  relates to?

12  A.   This is for the years '04, '05, '06.

13          **MR. BECRAFT:**  And could the witness be shown the next

14  page?

15          **THE DEFENDANT:**  And '07, '08, and '09.

16  **BY MR. BECRAFT:**

17  Q.   And what is your understanding as to the date of this

18  letter?

19  A.   There is no date on this letter, and there is no date on

20  when to petition tax court.

21  Q.   All right.

22          **MR. BECRAFT:**  Could the witness be shown the first

23  page of this exhibit?

24  **BY MR. BECRAFT:**

25  Q.   Now, you see the first page of Government Exhibit 3 on

WILLIAM WALLER - CONT. DIRECT

1    the screen?

2    A.    Yes.

3    Q.    Looking at the top, which we happen to have in yellow, do

4    you see your name?

5    A.    Yes.

6    Q.    Is the street address, Las Vegas, is that correct?

7    A.    Yes.

8    Q.    Over the years, has all of the communications back and

9    forth between you and the IRS, have you used this particular

10   address?

11   A.    Yes.

12   Q.    So this is not an incorrect address?

13   A.    No, not at all.

14   Q.    Did you ever receive -- see the numbers out on the first

15   page of Government Exhibit 3, the letters that are, for our

16   purposes, bolded in yellow, but there's a series of numbers in

17   the upper, left-hand corner.  Do you see those numbers?

18   A.    In the upper left, yes.

19   Q.    Did you ever receive any communications from the IRS that

20   had those numbers on it?

21   A.    You mean the certified mail receipt number?  No.  No.

22   Q.    Okay.  Mr. Waller, did you ever receive this letter right

23   here?

24   A.    No, I did not.

25          **MR. BECRAFT:**  Can the witness be shown

WILLIAM WALLER - CONT. DIRECT

1    Government Exhibit 192?

2            **THE COURT:**  How much longer are you going to be with

3    this witness?

4            **MR. BECRAFT:**  Probably 20 minutes, Judge.

5            **THE COURT:**  Because an hour ago you said it would be

6    45 minutes.

7            **MR. BECRAFT:**  I know.

8            **THE COURT:**  All right.

9            **MR. BECRAFT:**  You know how lawyers are.  They get --

10           **THE COURT:**  Pardon me?

11           **MR. BECRAFT:**  You know how lawyers can get

12   long-winded.

13           **THE COURT:**  No.  Gosh.  News to me.

14           What did you want now?  192?

15           **MR. BECRAFT:**  Do we have that exhibit?  Aah.

16   **BY MR. BECRAFT:**

17   Q.   Have you had the opportunity, prior to coming to court,

18   to look at this Exhibit 182 [sic]?

19   A.   I got this exhibit in discovery, so yes.

20   Q.   Okay.  And --

21           **THE COURT:**  This is 192, I thought.

22           **MR. BECRAFT:**  Oh.  Yes, Your Honor.  I wasn't looking

23   down closely at the number.

24           **THE DEFENDANT:**  I thought he was talking about the

25   one on the screen.

WILLIAM WALLER - CONT. DIRECT

1          THE COURT:  That's what I --

2          MR. BECRAFT:  Yeah, I'm talking about 192.  And I

3     misspoke.

4          THE COURT:  Oh that's fine.  I want the record to be

5     clear.  That's all.

6          MR. BECRAFT:  Can you go to the second page of

7     Exhibit No. 192.  Third page.  Fourth page.  Fifth page.

8     BY MR. BECRAFT:

9     Q.   Did you ever receive this in the mail from the IRS?

10    A.   No.

11         MR. BECRAFT:  Now, can the witness be shown

12    Government Exhibit No. 150?

13    BY MR. BECRAFT:

14    Q.   Have you seen this Government Exhibit 150 previously?

15    A.   Yes.

16    Q.   And the date of it's 9/11 of 2014?

17    A.   Correct.

18    Q.   Notice of intent to levy?

19    A.   Right.

20         MR. BECRAFT:  Can we move down a little bit further

21    down the page?

22    BY MR. BECRAFT:

23    Q.   And what is your recollection as to the year that this

24    related to?

25         THE COURT:  Well, if he's never seen it before, he

WILLIAM WALLER - CONT. DIRECT

1    wouldn't have any understanding.

2         **MR. BECRAFT:**  I thought he said he had received

3    this -- let me clarify the record.  If the Court didn't catch

4    it --

5         **THE COURT:**  If I'm --

6         **MR. BECRAFT:**  -- maybe I'm presuming something too

7    much.

8         **THE COURT:**  That's fine.  You've seen this before?

9         **THE DEFENDANT:**  I saw it in discovery.  Go to the

10   top.  I can't see what year it's for.

11        **THE COURT:**  That's all right.  So he saw it in

12   discovery.  Now, what's your question?

13        **MR. BECRAFT:**  My question is if he's ever seen this

14   before, this letter.

15        **THE COURT:**  And the answer is he saw it in discovery,

16   yes.

17   **BY MR. BECRAFT:**

18   Q.   Okay.  But at the -- this has the date of September 11th

19   of 2014.

20   A.   Correct.

21   Q.   Did you receive, sometime thereafter, this letter?

22   A.   Yes.

23   Q.   Okay.  And briefly, what did you understand this letter

24   to relate to?

25   A.    It's a final notice, a notice of intent to levy, and a

WILLIAM WALLER - CONT. DIRECT

1    notice for my right to a hearing.  "Please respond

2    immediately."

3              **MR. BECRAFT:**  Could the witness be shown

4    Government Exhibit 152?

5    **BY MR. BECRAFT:**

6    Q.   We have what's been previously admitted in this case,

7    Government Exhibit 152.  This is -- is this a letter that you

8    wrote?

9    A.   Yes.

10   Q.   Dated what?  September 29th of 2014?

11   A.   Yes.

12   Q.   And you wrote this letter to Ginger Wray --

13   A.   Correct.

14   Q.   -- at the IRS?

15            You sent it certified mail?

16   A.   Yes, I did.

17   Q.   All right.  And is this in response to the previous

18   letter?

19   A.   Yes.

20   Q.   Okay.  Over the years, has the IRS sent to you certified

21   mailings?

22   A.   Numerous.

23   Q.   In reference to all -- how do you know when the IRS sends

24   to you a certified letter?

25   A.   We get a notice at the house.  Either the mailman -- if

WILLIAM WALLER - CONT. DIRECT

1  I'm there, I'll answer the door and get it, or they'll leave a
2  tag on the door.
3  Q.   If you -- if the mailman came and he had a certified
4  letter, did you -- do you have any recollection as to ever
5  refusing any?
6  A.   No.  I've collected every single one I've ever gotten.
7  Sometimes there were a few, two or three, per week.
8  Q.   And for those where you were not at home and they left a
9  notice, what did you do in reference to those certified
10 mailings from the IRS?
11 A.   Went to the post office the next day and picked it up.
12 Q.   Okay.  Have you ever deliberately avoided picking up any
13 certified mail from the IRS?
14 A.   No, never.  That's when you get in trouble.
15         **MR. BECRAFT:**  Your Honor, if the Court was going to
16 take a morning break, this is a convenient spot.  Is that --
17         **THE COURT:**  No.  Keep going.
18         **MR. BECRAFT:**  Okay.  I'll do that.
19         **THE COURT:**  You said you were going to finish by
20 10:25.  So we'll go to 10:25.
21         **MR. BECRAFT:**  Government Exhibit 171.  And I've got a
22 series of exhibits in 171 -- 170 series that I'd like to get
23 through, Your Honor.
24 BY MR. BECRAFT:
25 Q.   We have on the screen Exhibit 171.  Did you ever receive

WILLIAM WALLER - CONT. DIRECT

1    this letter from the IRS?

2    A.    I believe so, yes.

3    Q.    Okay.  And what's your recollection?

4    A.    I believe so, yes.

5    Q.    All right.  Now, would this relate to some prior year of

6    the IRS trying to collect taxes?

7    A.    Yeah.

8              **THE COURT:**  It speaks for itself.

9              **THE DEFENDANT:**  It's --

10             **THE COURT:**  What's your question?

11   **BY MR. BECRAFT:**

12   Q.    My question is:  Can you look at the upper, right-hand

13   corner of this exhibit?  Do you see a tax period that this

14   letter relates to?

15   A.    Yes.  It's still 2003.

16             **MR. BECRAFT:**  Could the witness be shown

17   Government Exhibit 173?  This has been admitted into evidence.

18   **BY MR. BECRAFT:**

19   Q.    What's the date of this letter?

20             **THE COURT:**  Again, it speaks for itself.

21             **MR. BECRAFT:**  Okay.

22   **BY MR. BECRAFT:**

23   Q.    What's your understanding as to the years that this --

24   the letter relates to?

25   A.    This is for tax years 2004 through 2009.  This is the one

WILLIAM WALLER - CONT. DIRECT

1    that I never received the NOD.

2    Q.   Well, did you receive this letter?

3    A.   Yes.

4    Q.   Okay.  Did you receive the notice of deficiency that's

5    mentioned here in reference to the tax periods ending?

6    A.   No, I did not.

7    Q.   Once you received this letter, what, if anything, did you

8    do?

9    A.   I responded to Michael Freitag and let him know that I

10   did not -- not only did I not receive the NOD, but prior to

11   the collection due process hearing I told him I don't have --

12   I checked my records.  I don't have a copy of the NOD;

13   therefore, we don't need to meet because we still need to

14   abate the taxes.

15            MR. BECRAFT:  Okay.  Can the witness be shown

16   Government Exhibit 176?

17   BY MR. BECRAFT:

18   Q.   Describe what exhibit -- your understanding of what

19   Government Exhibit 176 is.

20   A.   It's a request for a collection due process hearing.

21   Q.   Do you know what years?

22   A.   You have to --

23            MR. BECRAFT:  Could we be shown the following pages?

24   BY MR. BECRAFT:

25   Q.   When did you mail this to the IRS?

WILLIAM WALLER - CONT. DIRECT

1    A.   January 23rd of 2015.

2    Q.   And what were you seeking to accomplish by making a

3    request for a collection due process hearing when you

4    submitted this document dated January 23rd, 2015?

5    A.   It was --

6             THE COURT:   Rather than requesting a due process

7    hearing?

8             MR. BECRAFT:   Yes, Your Honor.

9             THE COURT:   Other than that.

10            MR. BECRAFT:   I'm sorry?  I didn't hear the Court.

11            THE COURT:   Other than that.  I mean, the purpose of

12   this is to request the due process hearing; correct?

13            MR. BECRAFT:   That is correct, Your Honor.

14            THE COURT:   All right.  That's what the letter says.

15   You're asking is there something more?

16            MR. BECRAFT:   No, no.  I was -- could the witness be

17   shown the third page?

18   **BY MR. BECRAFT:**

19   Q.   Did you type this up, the third page?

20   A.   Yes.

21   Q.   And this CDP request related to what years?

22   A.   1999 to 2000.

23   Q.   In the very middle of what we see on the screen in

24   reference to this particular exhibit, can you tell the jury

25   why you would write out what we see there in the middle of the

WILLIAM WALLER - CONT. DIRECT

1    screen?

2    A.   Because those were the items that --

3            **THE COURT:**  The screens are down.

4            **COURTROOM ADMINISTRATOR:**  That exhibit is not

5    admitted, Your Honor.

6            **THE COURT:**  Oh.  The exhibit's not admitted?

7            **COURTROOM ADMINISTRATOR:**  Correct.

8            **MR. BECRAFT:**  I have in my notes --

9            **MR. MAGNANI:**  What's the exhibit number?

10           **MR. BECRAFT:**  I thought it was --

11           **COURTROOM ADMINISTRATOR:**  You said 176.

12           **MR. BECRAFT:**  I have 176.  Yeah, excuse me.  I wasn't

13   familiar with -- I don't see the exhibit numbers on the

14   screen, but what I have been asking questions to is

15   Government Exhibit 176, which I thought was something that we

16   had stipulated to.  But if I'm incorrect, I would like to, at

17   this time, offer the admission of Government Exhibit 176.

18       *(Government Exhibit No. 176, offered.)*

19           **MR. MAGNANI:**  Without objection.

20           **MR. BECRAFT:**  Okay.

21           **THE COURT:**  All right.  176 will be admitted then.

22       *(Government Exhibit No. 176, received.)*

23           **THE COURT:**  This is 176?

24           **MR. BECRAFT:**  Yes, Your Honor.  Move for Exhibit 176.

25           **THE COURT:**  Go ahead.

WILLIAM WALLER - CONT. DIRECT

1   **BY MR. BECRAFT:**

2   Q.   Now, 176 is dated in January of 2015.  What years did it

3   relate to?  Is it shown on the screen?

4   A.   1999 to 2000.

5   Q.   Okay.  What was happening in reference to those years at

6   that time?

7   A.   That was in request for a notice of lien that had been

8   filed.

9   Q.   Okay.

10           **MR. BECRAFT:**  Could the witness be shown

11   Government Exhibit 178, and --

12           **MR. MAGNANI:**  Yes.

13           **MR. BECRAFT:**  Okay.  This one has been admitted,

14   Your Honor.

15           **THE COURT:**  All right.  178.

16   **BY MR. BECRAFT:**

17   Q.   We have that exhibit on the screen.

18   A.   Yes.

19   Q.   All right.  It has a date on it of February 12th of 2015?

20   A.   Correct.

21   Q.   Did you receive this in the mail from the IRS?

22   A.   That I did receive, yes.

23   Q.   Okay.  And what was your understanding as to this letter?

24   A.   It was a notice of determination for the tax years 2003

25   through 2009.

WILLIAM WALLER - CONT. DIRECT

1   Q.   All right.  Now, for the year 2003, I believe you

2   previously testified that you received a notice of deficiency?

3   A.   Yeah, but I didn't get the hearing.

4   Q.   For the years 2004 through 2009, did you receive a notice

5   of deficiency?

6   A.   No.  Those years I did not get a notice of deficiency.

7   Q.   Did you ever -- and why do you -- what's your

8   understanding as to why you would receive this particular

9   exhibit probably sometime middle of February of 2015?

10          **THE COURT:**  How would he know why he should receive

11   this letter?

12          **MR. BECRAFT:**  Okay.  Let me back up then, Judge.

13  **BY MR. BECRAFT:**

14  Q.   Once you received this, would it be sometime shortly

15   after the date of the letter?

16  A.   Yes, of course.

17  Q.   And what went through your mind?  What did you believe

18   was happening at that time?

19  A.   Well, I was -- what I believe is I was either missing

20   documents or they were just rolling the process forward

21   without, you know, the proper channels.

22  Q.   Mr. Waller, if you had received a notice of deficiency

23   for the years 2004 through 2009, what, if anything, would you

24   have done?

25          **THE COURT:**  Well, that's speculation.  The evidence

WILLIAM WALLER - CONT. DIRECT

1    is he didn't receive them.

2          MR. BECRAFT:  But I think it's admissible to show

3    that -- what he would have done, Your Honor.  You know, the

4    government's making a point about it's shown that the notice

5    of deficiency was mailed but returned undelivered, and I think

6    that it's probative of his intentions, if he had received the

7    notice of deficiency, what he would have done.

8          THE COURT:  Except the government said -- I assume

9    the government says, "We sent you these," and he says, "No, I

10   never received them."  I mean, so there we are.

11   BY MR. BECRAFT:

12   Q.   Well, are you familiar with tax court procedures?

13   A.   Yes.

14   Q.   Have you ever been to tax court?

15         THE COURT:  You know, I'm not having him testify

16   about legal matters.  I mean, there's no foundation for them.

17   Did you ever go to law school or --

18         THE DEFENDANT:  No.

19         THE COURT:  -- study law?

20         THE DEFENDANT:  No.

21   BY MR. BECRAFT:

22   Q.   Have you studied -- have you been educated about what to

23   do when you get a notice of deficiency?

24         THE COURT:  Well, that's a different question.

25         MR. BECRAFT:  Yeah.

WILLIAM WALLER - CONT. DIRECT

1      **THE COURT:**  How -- what do you mean "been educated"?

2  He hasn't gone to law school.

3      **MR. BECRAFT:**  Yeah.  But even if you haven't been to

4  law school, there are people that --

5      **THE COURT:**  Well, but, see, there's an education;

6  right?  A curriculum and all of that at any school, you know,

7  as opposed to somebody just saying, "Yeah.  You know what?

8  This is the way it is," and blah, blah, blah.

9      **MR. BECRAFT:**  Well, I think it's appropriate for the

10  witness to --

11      **THE COURT:**  I'm glad you think it's appropriate, but

12  what's -- how is this relevant now?

13      **MR. BECRAFT:**  Well, it --

14      **THE COURT:**  What is the government --

15      **MR. MAGNANI:**  Your Honor, if the defendant is going

16  to testify that he would have done something in good faith if

17  he received it, the government would not object.  And if the

18  Court would allow it, we think --

19      **THE COURT:**  Well, I'll allow it then.

20      **MR. BECRAFT:**  Okay.  Good enough.

21      **THE DEFENDANT:**  Yeah.  If I would have received it, I

22  would have responded to it like I have any of the other ones

23  in the past.

24  **BY MR. BECRAFT:**

25  Q.   And have you heard about tax court before?

WILLIAM WALLER - CONT. DIRECT

1   A.   Yes.

2   Q.   Have you been to conferences where people were talking

3   about what to do?

4   A.   Yes.

5          **THE COURT:**  Well, but that's something different.

6   **BY MR. BECRAFT:**

7   Q.   Let me ask you a couple of little -- simple little

8   questions, and I'm going to move on to the last count in this

9   indictment.

10         Does your wife shop at Neiman Marcus?

11  A.   Maybe once or twice in her life, but not like the revenue

12  officer was saying, no.

13  Q.   All right.  Let's move on to the last count of the

14  indictment.  I want to kind of quickly move through it.

15         When did you buy that house on Sable Mist?

16  A.   2002.

17  Q.   Did you pay cash for it?

18  A.   No.  I took out a -- it was a ten-year, interest-only,

19  HELOC loan.

20  Q.   Did you approach a bank to finance the purchase?

21  A.   Yes.  It was Wells Fargo.

22  Q.   Now, the -- we don't have the deed here, but you went to

23  a closing to buy the house?

24  A.   Correct.

25  Q.   And the date of the deed would be the date of the

WILLIAM WALLER - CONT. DIRECT

1    closing?

2    A.    Yes.

3    Q.    And the financing for you to purchase that house, some of

4    it came from Wells Fargo?

5    A.    Correct.

6    Q.    How much?

7    A.    I believe it was $464,000.

8    Q.    Were there funds that you used to also purchase the

9    house --

10   A.    Yes --

11   Q.    -- that came from you?

12   A.    -- it was 20 percent down.

13   Q.    And how much was that in reference to your purchase of

14   the Sable Mist house in 2002?

15   A.    I believe it was about $116,000.

16   Q.    All right.  So the bank came up with everything but the

17   116,000 that you came up with?

18   A.    Correct.

19   Q.    What were the terms that you recall that related to the

20   payment -- monthly payment you would have to make to

21   Wells Fargo?

22   A.    It was a ten-year, interest-only loan.  It was

23   approximately 15 -- $1,570 a month, but it was interest only.

24   The -- the -- on day 1 the balance was $464,000.  Ten years

25   later, when the property had to be refinanced, it was the same

WILLIAM WALLER - CONT. DIRECT

1    amount.  It was $464,000.

2    Q.    Okay.  So from the first payment all the way up until

3    2012, say mid 2012, the payments you were making were what

4    amount every month?

5    A.    It was like 15-something every month, but it was just

6    interest.  The reason why the principal never went down was

7    because it was an interest-only loan.

8    Q.    Okay.  The loan that you had at that time was a ten-year

9    loan, and your testimony about when that ten-year loan would

10   expire was -- would be what?

11   A.    2012.

12   Q.    Okay.  Can you give us a better date?

13   A.    I believe it was towards the end of 2012.  I think

14   November.

15   Q.    Okay.  Were you anticipating, say, about, like, September

16   or October that you needed to do something about refinancing?

17   A.    Yeah.  It was very much on my mind.  I had gotten letters

18   saying that that program was ending, and I asked the

19   Wells Fargo Equity Group if we could modify that existing

20   program.  And they said no, that that product was no longer

21   available.

22   Q.    Okay.  Let me back up.  This is the first event that you

23   had with Wells Fargo as you're approaching the time that

24   you're going to have to pay off the mortgage?

25   A.    Correct.

WILLIAM WALLER - CONT. DIRECT

1    Q.   So you made a contact with the folks at Wells Fargo?

2            THE COURT:   That's what he testified to.

3            THE DEFENDANT:   Yes.

4    BY MR. BECRAFT:

5    Q.   And was there a particular branch of Wells Fargo that you

6    contacted?

7    A.   Well, it was the same people I was making payments to,

8    the equity side.

9    Q.   Okay.   And did you receive any type of response from

10   them?

11   A.   Yes.   The --

12   Q.   Okay.   What is it that you learned?   When you made that

13   inquiry and you had a conversation with them, what did you

14   learn was the position of Wells Fargo regarding refinancing

15   your house?

16   A.   Okay.   I couldn't do anything with the current loan

17   because that product was no longer available.   I said, I don't

18   have any problem making the monthly payment.   My problem is

19   making the balloon, which was $464,000.   I said, I needed to

20   find a program where I could refinance it.   And they said,

21   Well, the first thing you have to do is talk to the home

22   preservation side.   Because that was the agreement they had

23   with the government.   That was where the HAMP and the HAFA and

24   the HARP money was.

25            And I said, Well, I need to get a program the same

WILLIAM WALLER - CONT. DIRECT

1   way that -- when I bought the house.  I didn't have any tax

2   returns.  And they said, Okay, well, you have to exhaust HAMP

3   first.  And when you exhaust them, then come back to us.

4           Now, the problem with HAMP and HAFA was the package

5   that they give you, it says the very first thing they need is

6   to state the hardship.  The second thing was they needed tax

7   returns, which I didn't have.  So they basically declined

8   me --

9   Q.   Okay.  Let me stop you right here.  Let's kind of put

10  this in context.

11          **MR. BECRAFT:**  Can the witness be shown

12  Government Exhibit 401?  And I'd like to review 402, 404, 405,

13  and 406 in the next few minutes.  But 401.  Could the witness

14  be shown 401?

15  **BY MR. BECRAFT:**

16  Q.   Is this a letter from you to Wells Fargo?  Or it's from

17  Wells Fargo to you?

18  A.   No.  It's from Wells Fargo to me.

19  Q.   Yes.  And the date is September 20th, 2012?

20  A.   Yes.

21  Q.   All right.  And is this the letter that told you about

22  the requirements for refinancing?

23  A.   Scroll down.

24          No.  She's just basically saying that the loan's

25  coming up due.

WILLIAM WALLER - CONT. DIRECT

1    Q.    Nicole Antisdel is the way I pronounce that name.

2    A.    Yeah.  She was the home preservation specialist.

3    Q.    Okay.  Was she the party that you were mentioning a

4    minute ago that was the folks that were dealing with your

5    first contact?

6    A.    No.  She was on the other side.  I was dealing with the

7    people at the equity side first.

8    Q.    Okay.

9    A.    They were the ones that told me to contact them and

10   exhaust those measures before they could actually refinance

11   me.

12   Q.    Okay.

13        **MR. BECRAFT:**  Could the witness be shown

14   Government Exhibit 402?

15   **BY MR. BECRAFT:**

16   Q.    Did that lady that I just mentioned the name that's hard

17   to pronounce, did she respond and send you this letter of

18   September 27th of 2012?

19   A.    Yes.

20   Q.    Did she tell you the information you were required to

21   provide?

22   A.    Yeah.  It's those three bullet points:  Explain the

23   hardship, submit the required documentation of your income,

24   and then complete the monthly trial period payments.

25   Q.    Okay.  What you have just noted for us appears on the

WILLIAM WALLER - CONT. DIRECT

1    first page of Government Exhibit 402.  Well, you can't see --

2    A.   I don't see the exhibit --

3    Q.   -- the exhibit number, but this is -- I'm going to

4    represent to you that this is Exhibit 402.

5    A.   Okay.

6    Q.   This is the first page.

7    A.   Sure.

8    Q.   And these are the representations that we see in yellow?

9    A.   Correct.

10   Q.   Okay.  Thank you.

11        Well, for these conditions that were laid out for

12   you, did you think you could comply?

13   A.   No.  Because that's the government side, and all of the

14   programs for HAMP and HAFA all required tax returns.

15        **MR. BECRAFT:**  Could the witness be shown

16   Government Exhibit 404?  Can you blow up the first half of

17   that?  Yes.  Perfect.

18   **BY MR. BECRAFT:**

19   Q.   So the one side of Wells Fargo's wanting you to provide

20   information.  Is this letter from you -- this is your letter

21   back?

22   A.   To Nicole, yes.

23   Q.   The date of it 10/2/2012, October 2nd, 2012; right?

24   A.   Yes.

25   Q.   Do you see the line on there that talks about tax

WILLIAM WALLER - CONT. DIRECT

1    returns?

2    A.   Yes.

3    Q.   Is the line that says, "I have no tax returns for the

4    last two years," is that correct?

5    A.   That was correct.

6    Q.   All right.  Was that one of the conditions in order for

7    you to refinance with HAMP?

8    A.   Yes.

9    Q.   Well, what about those words right before that?

10   A.   Okay.  That --

11   Q.   "I have not been working for the last two years" --

12   A.   Yeah.

13   Q.   -- "due to the real estate crash."

14   A.   Right.  That was incorrect.  It was -- and I did not make

15   that statement to the bank in any way to influence a decision

16   either to grant the loan or decline the loan.

17         I said that as a reason to say why I didn't have tax

18   returns as opposed to saying my true position as to why I

19   don't have tax returns, which is there's no law that makes me

20   liable; therefore, I'm not required to file; therefore, I

21   don't have any tax returns.  It was just -- I just said I had

22   not been working as if to -- I already knew they were going to

23   decline the loan because I didn't have tax returns.  I didn't

24   say it to get the loan, nor did I say it to actually have it

25   decline.  I just said it to reference that's why I don't have

WILLIAM WALLER - CONT. DIRECT

1    any tax returns.

2    Q.    All right.

3         **MR. BECRAFT:**   Could the witness be shown Government

4    Exhibit 405?

5    **BY MR. BECRAFT:**

6    Q.    October 8th of 2012, did you receive this letter?

7    A.    Yes.

8    Q.    And what's your understanding as to what this letter

9    is -- why it's being sent to you?

10   A.    Well, I'd already -- I believe I had already sent the fax

11   saying I don't have tax returns, and I think this was a letter

12   in response saying, We still need your information, we're

13   still requesting additional information from you.

14   Q.    Okay.

15   A.    I believe that's from Nicole.

16   Q.    So for the branch of Wells Fargo that this Nicole lady

17   worked for and you submitted the information, did you get a

18   loan modification?

19   A.    No.  They declined the loan.

20   Q.    All right.  What happened after that?

21   A.    I went right back to Wells Fargo, the home mortgage side,

22   and he told me -- he's the same guy that said, Go to the home

23   preservation side; you're going to get declined because you

24   don't have tax returns, but you have to exhaust them first.

25   When you're done with them, come back to us, and we will go

WILLIAM WALLER - CONT. DIRECT

 1   ahead and refinance you.

 2            And that's what I did, and they refinanced it.

 3            **MR. BECRAFT:**   Can the witness be shown

 4   Government Exhibit 406?

 5   **BY MR. BECRAFT:**

 6   Q.   What's your understanding of 406?

 7   A.   Well, this was the -- this was the home equity

 8   modification agreement.  This is where they approved it after

 9   I had been declined at the HAMP side.

10   Q.   So your ten-year loan was to mature and be due and

11   payable September or October, maybe November, of 2002?

12   A.   Correct.

13   Q.   Did Wells Fargo refinance?

14   A.   Yes, they did.

15   Q.   And once the loan was refinanced, what's your

16   recollection as to the terms of this new mortgage?

17   A.   The -- the new agreement was actually a -- now it's a

18   40-year fixed, and I believe the -- I'm not sure what the

19   interest rate was, but I know the payment -- oh.  Here.  The

20   payment went up to $1,726 whereas the original payment was,

21   like, $1,500 and some change.

22            So it was ten years for the interest only.  Then

23   another 40 years for the modification.  So 50 years total.

24   Q.   In that period of time during the existence of the first

25   loan, the 2002 through 2012, what was the balance due at all

WILLIAM WALLER - CONT. DIRECT

```
1    times --
2            THE COURT:  He's already testified to that.
3            MR. BECRAFT:  Okay.
4    BY MR. BECRAFT:
5    Q.   Did you ever borrow additional funds from Wells Fargo
6    that were a -- added to the amount that you owed on that loan?
7    A.   No.  It never went above the 464.  But there was times
8    that we withdrew, and then it actually -- when Century 21 went
9    bankrupt, we were going to be one of the bidders on it.  So I
10   believe we took out money for that, and then we were not the
11   winning bid.  So the money actually went right back into it.
12   Q.   So at all times, other than that transaction, there was
13   no change in the amount that you owed or had borrowed?
14   A.   No.  Unless there was any additional principal -- it was
15   always -- you know, the government says that it was always
16   leveraged to the max.  That's because that was that type of a
17   loan.  The -- since it was an interest-only loan, there was
18   never any principal balance coming often.  So it was always
19   basically maxed at the 464.
20   Q.   Let me conclude with this.  Are you guilty of the crimes
21   charged in the indictment --
22   A.   No.
23   Q.   -- Mr. Waller?
24   A.   No.
25           MR. BECRAFT:  Nothing further, Your Honor.
```

WILLIAM WALLER - CONT. DIRECT

1        **THE COURT:**  All right.  Why don't we take our morning

2   recess at this time.

3        During this recess, I again admonish you not to

4   discuss this case among yourselves or with anyone else; not to

5   listen to, read, or watch any report of or commentary on the

6   trial, by any person connected with the trial, or by any

7   medium of information, including, without limitation,

8   newspaper, television, radio, or the Internet.

9        And you are not to form or express an opinion on any

10  subject connected with this case until it's finally submitted

11  to you, under instructions from me, for your deliberations.

12        So we'll be in recess for ten minutes.  Let's say

13  until 10:45.  Twelve minutes.

14        **COURTROOM ADMINISTRATOR:**  All rise.

15     *(Jury out at 10:33 a.m.)*

16     *(Recess at 10:33 a.m., until 10:50 a.m.)*

17     *(Jury in at 10:50 a.m.)*

18        **COURTROOM ADMINISTRATOR:**  All rise.

19        **THE COURT:**  All right.  Thank you.  You may be

20  seated.

21        Do the parties stipulate to the presence of the jury

22  and the alternates?

23        **MR. BECRAFT:**  We do, Your Honor.

24        **MR. MAGNANI:**  Yes, Your Honor.

25        **THE COURT:**  All right.  Call your next witness.

WILLIAM WALLER - CROSS

1    **MR. MAGNANI:**  Cross-examination, Your Honor.

2    **THE COURT:**  Oh.  I'm sorry.  I apologize.  Yeah.  I'm

3    trying to speed things up too much.  Cross-examination first.

4    **MR. MAGNANI:**  Unfortunately, Your Honor, I don't

5    think we'll finish before lunch.

6    **THE COURT:**  I don't expect you to.

7                    **CROSS-EXAMINATION**

8    BY MR. MAGNANI:

9    Q.    Good morning, Mr. Waller.

10   A.    Good morning.

11   Q.    Now, you are aware of the charges that have been brought

12   in this case; right?

13   A.    Yes.

14   Q.    And you're aware that, for each of those charges, the

15   government's -- has to prove certain elements?

16   A.    Correct.

17   Q.    And are you familiar with those elements?

18   A.    You could refresh my memory.

19   **THE COURT:**  Let me stop you just for a second.  Would

20   you all excuse me for just a moment?  I left something in the

21   office, in the chambers.  I'll be two minutes.  I'll be right

22   back.

23   *(Pause, 10:52 a.m.)*

24   *(Resumed, 10:52 a.m.)*

25   **THE COURT:**  All right.  I apologize for the

WILLIAM WALLER - CROSS

1    interruption.  I had to get my iPad.

2           All right.  Now go ahead, Mr. Magnani.

3    **BY MR. MAGNANI:**

4    Q.   I'm not asking you to recite the elements, but are you

5    generally familiar with the different types of things that the

6    government's tried to prove in this case?

7    A.   Yes.

8    Q.   And do you agree with what Mr. Becraft said in opening,

9    that essentially you only really dispute the intent elements?

10   A.   Correct.

11   Q.   Okay.  Because each of those crimes has a certain intent

12   that the government has to prove?

13   A.   Right.

14   Q.   And so you've testified about your intent today?

15   A.   Yes.

16   Q.   But you don't really dispute the other elements for the

17   most part?

18   A.   I dispute the fact that I'm liable, but I'm here on good

19   faith.

20   Q.   Okay.  Well, if you don't mind, if I could just sort of

21   go through some of the facts?  I just want to know if you

22   agree or not.  I hope these are uncontroversial questions.

23   A.   Sure.

24   Q.   But you agree that you became an agent in Nevada in '94

25   and then a broker in 2012; right?

WILLIAM WALLER - CROSS

1   A.   Yes.

2   Q.   And that in the years following, from 2004 onward, you

3   earned commissions as a broker or agent every year?

4   A.   Yes.

5   Q.   And I believe you said before that the amounts that you

6   earned were accurately reflected on the 1099s; is that right?

7   A.   Yes.

8        **MR. MAGNANI:**  If I could please show Exhibit 214.  I

9   believe this is in evidence and can be shown to everyone.

10  **BY MR. MAGNANI:**

11  Q.   So -- and just take a second to look at it, Mr. Waller.

12       Would you agree that the numbers in Exhibit 214 are

13  roughly accurate to the amount of commissions that you

14  received in each of those years?

15  A.   I would say roughly accurate, yeah.

16  Q.   And would you agree with me that commissions are a type

17  of income?

18  A.   Yes.

19  Q.   Okay.  Now, you also -- you agree that -- the government

20  has proven that -- and you agree with that you haven't filed

21  tax returns from 1999 until present; right?

22  A.   Correct.

23  Q.   And in 1998, you filed a zero return; right?

24  A.   Correct.

25  Q.   And you agree that you haven't paid a dollar in tax since

WILLIAM WALLER - CROSS

1    1998; right?

2    A.    Correct.

3    Q.    And that the IRS has not taken a dollar in tax from you

4    since 1998?

5    A.    Correct.

6    Q.    But they did try; right?

7    A.    Yes, they did try.

8    Q.    During the course of the collection efforts, you never

9    met with any of the revenue officers that tried to collect;

10   right?

11   A.    No.

12   Q.    You often appealed things; is that right?

13   A.    I appealed for due process hearings and so forth, yes.

14   Q.    You filed a lot of lawsuits?

15   A.    I was acting within the legal bounds, yes.  That was part

16   of the administrative remedy.

17   Q.    So the answer is "yes"?

18   A.    Yes.

19   Q.    Would you agree that you oftentimes, after filing the

20   initial complaint, you never filed any other pleadings

21   requested by the court?

22   A.    Well, there was -- there was some 23 third-party

23   summonses that were actually filed all across the country.

24   Because the summonses were sent out on all these different

25   entities where you had to file in those locations.  They

WILLIAM WALLER - CROSS

1    couldn't be done here in Nevada.  So since it was so spread

2    out, yes, there was -- we didn't finish them.

3    Q.   So the answer is "yes"?

4    A.   Yes.

5    Q.   And you agree that all of those lawsuits were dismissed?

6    A.   Yes.

7    Q.   Do you agree that you never gave the IRS any bank records

8    or other documents about your work?

9    A.   Yes.

10   Q.   Do you agree that you sent letters to banks and

11   Century 21 demanding that they not give any records to the

12   IRS?

13   A.   Yes.

14   Q.   Do you remember when Revenue Agent Bourne or Bell

15   testified?

16   A.   Yes.

17   Q.   Do you remember when he was asked questions about

18   conversations he had with I believe it was Debra at

19   Century 21?

20   A.   Okay.  Yes.

21   Q.   Okay.  You know who Debra is?

22   A.   Yeah.  She's deceased.

23   Q.   Right.

24        And can you just tell the jury basically what you

25   told Debra when the IRS tried to collect records from her?

WILLIAM WALLER - CROSS

1    A.   I told her that, as part of our contract, that she

2    didn't -- she didn't have the right to turn over any books or

3    records, and I had the right to challenge everything

4    administratively.

5    Q.   And when you say your contract, do you mean like your

6    employment contract with Century 21?

7    A.   There was an agreement with me and Red, the owner.

8    Q.   I just want to make sure we're talking about the same

9    thing.  Is it -- is this a verbal agreement that you had with

10   Red, or was this just the contract that you signed when you

11   started working --

12   A.   I don't think it was in the written contract, but that

13   was -- when this all started happening, I had contact with the

14   owner.  Her and I had the discussion.

15   Q.   Do you remember when Revenue Officer Soto testified?

16   A.   Yes.

17   Q.   And do you remember the instance he was testifying about,

18   the two -- the October 2008 levy on one of your bank accounts?

19   A.   Yes.

20   Q.   When he levied the bank account, you were able to defeat

21   that levy; right?

22   A.   That's correct.

23   Q.   Because he did it improperly; right?

24   A.   Well, it was a fraudulent levy.  He actually handwrote

25   the EIN number in where my social security number was and

WILLIAM WALLER - CROSS

```
 1   tried to levy the corporate account for tax claims against me.
 2   So I challenged him, sent him a memorandum from his chief
 3   counsel saying that what you're doing is illegal as per your
 4   chief counsel's own -- even if it's a single-party LLC and
 5   that single-party LLC member is the taxpayer, you can't levy
 6   one against the other.
 7   Q.   Do you remember what my question was, Mr. Waller?
 8   A.   Yes.
 9   Q.   My question was:  Was it an improper levy?
10        Is the answer "yes"?
11   A.   Yes.
12   Q.   Now, after you were able to defeat -- now, that -- that
13   levy was for tax years before 2004; right?
14   A.   I believe so.
15   Q.   Well, in October 2008, your taxes for 2004 through '9 had
16   not even been assessed yet; right?
17   A.   Correct.
18   Q.   So would you agree with me that that levy was for tax
19   years before 2004?
20   A.   Yes.
21   Q.   And would you agree with me that you never paid any tax
22   for those years?
23   A.   Correct.
24   Q.   The IRS never got any tax?
25   A.   Yes.
```

WILLIAM WALLER - CROSS

1    Q.    And so you essentially were able to defeat their

2    collection efforts?

3    A.    Yes.

4    Q.    Now, you also would agree with me that the Statute of

5    Limitations for the IRS to collect on many of those past years

6    has expired?

7    A.    Yes.

8    Q.    And do you remember when Ms. Morgan testified?

9    A.    Yes.

10   Q.    And I think she said it was about $700,000 worth of

11   liability that's no longer collectible.  Is that your

12   recollection?

13   A.    I believe so, yes.

14   Q.    Do you agree with that?

15   A.    Yes.

16   Q.    Okay.  So is it -- is it fair to say that you were able

17   to defeat the payment of about $700,000?

18   A.    Yes.

19   Q.    Now, I want to talk about your bank accounts.

20   A.    Um-hum.

21   Q.    Is it correct that you have not used a personal bank

22   account since around early 2006?

23   A.    I believe so, yes.

24   Q.    About when you -- about in March when you opened the

25   Community Bank account in Burbank Holdings' name?

WILLIAM WALLER - CROSS

1    A.    Right.

2    Q.    Okay.  Now -- and I think you said that you created

3    Burbank Holdings -- I believe you said, quote, It's a

4    protection device.  Was that your testimony?

5    A.    Correct.

6    Q.    And you said that you need the account to -- and correct

7    me if I'm wrong, but I believe you said, quote, Accept funds

8    from clients; is that right?

9    A.    It was for all corporate -- yeah.  It's all banking.

10   Q.    Okay.  Can you describe a situation, when working as a

11   real estate agent, when you would have to accept funds from

12   clients?

13   A.    Earnest money, deposits.  This was prior to the property

14   management when you get into security deposits and rental

15   checks.

16        MR. MAGNANI:   Could we please pull up Exhibit 202?

17   Now -- and is there another page to this exhibit, or is it

18   just this?

19   BY MR. MAGNANI:

20   Q.    Now, Exhibit 202, you would agree with me that this is a

21   summary of all deposits in your bank account between 2007 and

22   2009?

23   A.    Yes.

24   Q.    Would you be able to identify any deposits in those years

25   that were earnest money deposits from clients as opposed to

WILLIAM WALLER - CROSS

1   real estate commissions?

2   A.   Not on some of the bigger ones that are lumped in, no.

3   It's just a summary; right?

4   Q.   Well, if you keep scrolling through, anything there that

5   you think is an earnest money deposit?

6   A.   I saw one for 3,000 even, which could have been.

7   Q.   Okay.  So maybe one?

8   A.   Possibly, yeah.

9   Q.   Now, I think you also testified about how you can't

10  commingle -- you said something about how it's improper to

11  commingle funds?

12  A.   Commingling with other clients' funds, yes.

13  Q.   Okay.  Now, you --

14  A.   Personal accounts.

15  Q.   Okay.  Now, you used your Burbank account for business

16  and personal reasons; right?

17  A.   Correct.

18  Q.   So -- and that was because you didn't have a personal

19  bank account?

20  A.   Correct.

21  Q.   So you had to use it for those reasons?

22  A.   Right.

23  Q.   Okay.  Now, when you --

24        **MR. MAGNANI:**  If I could have Exhibit 153, please,

25  which is in evidence?  And I'm sorry.  I don't know the page,

WILLIAM WALLER - CROSS

1    but if you -- oh, actually, could you go to the next page,

2    please?  And the next.  The next.  One more.

3    **BY MR. MAGNANI:**

4    Q.    This is a letter that you wrote to Revenue Officer Soto

5    in October 2008; right?

6    A.    Correct.

7    Q.    Now, when you said that, "As you are aware,

8    William Waller is not Burbank Holdings, LLC," you were making

9    a distinction between yourself, as a person, and your entity;

10   correct?

11   A.    Correct.

12   Q.    But you would agree that your entity's bank account

13   engaged in both your personal and your business transactions;

14   right?

15   A.    Correct.

16          **MR. MAGNANI:**  Now, can I please have Exhibit 189?

17   And can we go to the second page, please?

18   **BY MR. MAGNANI:**

19   Q.    Now, this is a letter that you sent to Special Agent Peng

20   in 2016; right?

21   A.    Right.

22   Q.    And in this letter you said that, for tax purposes,

23   single-member LLCs are considered sole proprietorships by the

24   Internal Revenue Service?

25   A.    Right.

WILLIAM WALLER - CROSS

1   Q.   Do you remember why you were, in this case, saying that

2   you and Burbank Holdings were the same?

3   A.   Well, because Burbank Holdings was the only account that

4   actually had bank accounts.  The other LLCs were created to

5   hold properties, which never came to fruition.

6   Q.   And --

7   A.   Burbank Holdings was the only account that was really

8   used on a regular basis.

9   Q.   And you -- the entities that -- you had received grand

10  jury subpoenas; is that right?

11  A.   Yes.

12  Q.   And is it correct to say that the entities never

13  responded?

14  A.   We responded with that letter.

15  Q.   Well, let me ask a different question.  Is it fair to say

16  the entities never gave the documents that were requested of

17  them?

18  A.   There was no documents to give.  They were just LLCs.

19  Q.   So is your testimony that there were no documents to give

20  for Burbank Holdings?

21  A.   Well, Burbank Holdings, as I said in the letter, was the

22  only one that was, at the time, legit.  The others were...

23  extinct basically.

24  Q.   So because you were using the Burbank Holdings account

25  for personal things -- I mean, you've seen the testimony

WILLIAM WALLER - CROSS

1    about, for example, the mortgage payments out of your

2    Burbank Holdings account.  Do you agree with that testimony?

3    A.    Yes.

4    Q.    Okay.  I think you also testified about how it was an

5    interest-only mortgage?

6    A.    Correct.

7          **MR. MAGNANI:**  Could we please have Exhibit 217?

8    **BY MR. MAGNANI:**

9    Q.    Now, Mr. Waller, I believe you testified you bought that

10   house with 20 percent down, and then it was an interest-only

11   mortgage for ten years; is that right?

12   A.    Yes.

13   Q.    And the house is in a gated community; right?

14   A.    Correct.

15   Q.    Now, I know the amounts changed a little bit over the

16   years, but --

17         **MR. MAGNANI:**  And if you could just page through this

18   document, please.

19   **BY MR. MAGNANI:**

20   Q.    Would you agree that your interest payments --

21         **MR. MAGNANI:**  And you can just keep going,

22   Ms. Burgess.

23   **BY MR. MAGNANI:**

24   Q.    -- that your interest payments were roughly $1,500 a

25   month, sometimes more, sometimes less, and sort of increased

WILLIAM WALLER - CROSS

1    over time?

2    A.    Yes.

3    Q.    Okay.  Now, there was nothing that prevented you from

4    paying more than just the interest; right?

5    A.    Other than the fact that we still had to pay taxes and

6    insurance and homeowners dues.  It was still a mortgage

7    payment even though it was only interest only, yes.

8    Q.    So when you say that you had to pay taxes, what do you

9    mean?

10   A.    Property taxes.

11   Q.    Okay.  So you pay property taxes?

12   A.    Yeah.  This was just -- that was just the interest

13   payment.  There was still property taxes, homeowner's

14   insurance, HOA dues actually to three different entities.

15   Q.    Why do you pay property taxes?

16   A.    Because it's required.

17   Q.    Okay.  Can you cite the code section that requires it?

18   A.    No.

19   Q.    Why not?

20   A.    Because it's -- it's required.  It's actually part of --

21   it's Nevada -- it's Nevada's law.

22   Q.    So, I'm sorry, I don't know if I -- maybe I missed it,

23   but what was the answer to the question about there's nothing

24   that prevented you from paying more than interest on the

25   mortgage?  Is that right?  Was there anything preventing you?

WILLIAM WALLER - CROSS

1    A.    Well, the -- the minimum payment was what we pay.

2    Whatever the -- whatever the payment was on the coupon, that's

3    what we paid.

4    Q.    My question is:  Was there anything preventing you from

5    paying more?

6    A.    No.

7    Q.    I think you said on direct -- but please correct me if

8    I'm wrong -- that you said, because of the type of the loan it

9    was, you said it was, quote, Basically always maxed because of

10   the type of loan it was.  Is that what you said?

11   A.    Yes, it was -- originally it was a 464 draw on day 1, and

12   that's what it was ten years later when it was refied,

13   remoded.

14   Q.    And basically always is not the same as always; right?

15   A.    Correct.

16   Q.    So you did sometimes pay down the principal?

17   A.    Never paid the principal down.  Maybe take a draw on it

18   and then put it back in.

19   Q.    Well, when you say "take a draw on it," what do you mean?

20   A.    Well, there was times where -- I think I had gotten

21   something from my grandfather.  We installed it or deposited

22   it, and then withdrew it.

23   Q.    So if we go to the first page of this exhibit, you see

24   the 222,000-dollar payment on August 31st, 2006?

25   A.    Yeah.  I have no idea what that is.

WILLIAM WALLER - CROSS

1   Q.    So --

2   A.    I don't know where that came from.

3   Q.    And I just want to make sure I understand your position

4   on this payment.  Are you saying that you think the -- the

5   summary is wrong, or that you just don't remember what it was?

6   A.    I have no idea what it is.  I mean, that -- what is that?

7   A payment of 222,000 to?  I have no idea what that is.

8   Q.    Okay.  So let me ask you this question.  Do you see on

9   December 31st there was a draw of $60,000?

10  A.    Yes.

11  Q.    And on January 31st there was a draw of $50,000?

12  A.    Yes.

13  Q.    And on June 30th, 2007, there was a draw of $10,000?

14  A.    Yes.

15        **MR. MAGNANI:**  Can you go to the next page, please?

16  **BY MR. MAGNANI:**

17  Q.    Another draw here on August 31st?

18  A.    Yep.

19  Q.    For 25,000?

20  A.    Um-hum.

21        **MR. MAGNANI:**  Next page, please.

22  **BY MR. MAGNANI:**

23  Q.    Fair to say that, between December 31st and March 31st,

24  you drew about $125,000?

25  A.    According to that, yeah.

WILLIAM WALLER - CROSS

1   Q.   Well, I'm just asking you about if -- if -- if this

2   accurately reflects --

3   A.   I don't believe it is.  We've never used that loan as --

4   as an ATM --

5   Q.   So --

6   A.   -- other than on a few occasions, and it usually went

7   right back in.  I have no idea what those figures are for

8   other than maybe one or two that -- but the 220 and some of

9   these other ones I don't know.

10  Q.   Well, right now let's put the 220 to the side.  I'm just

11  sort of asking about the draws.  I mean, I guess you said you

12  used it a few times, but you just don't remember all of these?

13  A.   Correct.

14  Q.   Well, let me ask you this.  If you did not pay the

15  principal, what were you drawing on when you made the draws

16  that you do remember?

17  A.   The interest.

18  Q.   Drawing on the interest?

19  A.   There was -- if it was a home equity line, that's all

20  there was.  All we ever paid was interest.  So whatever we put

21  in over and above was able to be drawn out.

22  Q.   But you were -- and maybe I misunderstood.  I thought you

23  said you never did make payments over and above and that you

24  didn't know what the --

25  A.   No.  I said if I ever -- if I ever received a check, then

WILLIAM WALLER - CROSS

1    I would actually put it in above the 464, and then we were

2    always able to draw off of that.

3    Q.   So this summary, would you agree, doesn't show any

4    payments against the principal with the exception of the

5    222,000?

6    A.   Against the principal, correct.

7    Q.   Okay.  Now, Mr. Becraft was asking you some questions

8    about the loan modification.

9    A.   Um-hum, yes.

10   Q.   And, you know, fair to say, as we went over in the

11   beginning, that basically your position is that you did not

12   intend to influence the bank?

13   A.   Not in any way.

14   Q.   Okay.

15        **MR. MAGNANI:**  Can we please pull up Exhibit 402?

16   **BY MR. MAGNANI:**

17   Q.   Which I believe you were shown in direct testimony.

18        Now, this is the document -- and I -- I think you

19   testified about this, but I just -- correct me if I'm wrong.

20   Basically the bank asked you to show three different things to

21   qualify for HAMP?

22   A.   Correct.

23        **MR. MAGNANI:**  And can we please have Exhibit 400?

24   **BY MR. MAGNANI:**

25   Q.   And would you agree that the letter that you sent in

WILLIAM WALLER - CROSS

1  response addresses all three of those things?

2  A.   Yes.

3  Q.   Now, you testified that you knew you couldn't qualify;

4  right?

5  A.   Yeah, once I saw the requirements and also from the other

6  bank rep.

7  Q.   But you sent this letter anyway?

8  A.   Because I had to exhaust that program before I could get

9  refied on the other side, yes.

10  Q.   Okay.  And you did not just send them a letter that said,

11  Sorry, I can't qualify for this one; right?

12  A.   Correct.

13  Q.   You did not just say, I made $400,000 last year, I do not

14  have a hardship, you didn't say that; right?

15  A.   Well, my hardship was I didn't have any tax returns.

16  Q.   So when you said that you hadn't worked because of the

17  real estate crash, are you saying that you did not intend to

18  tell the bank that your hardship was due to the real estate

19  crash?

20  A.   I'd explained this earlier.  The reason I said that, it

21  was easier to justify why I didn't have the tax returns as

22  opposed to explaining my position, again, that there was -- I

23  had no liability to pay the income tax; therefore, I had no

24  required filing requirement.  I knew it was going to be

25  declined based on the fact I didn't have the documentation for

WILLIAM WALLER - CROSS

1    tax returns.

2    Q.   So was the answer "yes"?

3    A.   I guess.

4    Q.   Well, Mr. Waller, if you can answer the questions yes or

5    no, would you sort of give me and the jury the courtesy of

6    doing that?

7    A.   Sure.

8    Q.   I mean, I've been fair with you, don't you think?

9    A.   Yes.

10   Q.   Did I let you explain everything you wanted to explain on

11   direct?

12   A.   Yes.

13   Q.   Did I object to leading questions?

14   A.   No.

15   Q.   Okay.  So if you could please just do us all the

16   courtesy.  If you can honestly answer the question yes or no,

17   would you please just promise me you'd do that?

18   A.   With no explanation?  Sure.  I'll try.

19   Q.   If you need an explanation, please let me know.

20   A.   Yeah.

21   Q.   Now, you were attempting to qualify for -- basically you

22   were seeking credit; right?

23   A.   No.  I was seeking to remod.

24   Q.   Sure.  But you needed a new loan because your loan was

25   going to end; right?

WILLIAM WALLER - CROSS

1   A.   Correct.

2   Q.   Okay.  Did you think about telling the bank that you made

3   a lot of money and you could easily cover the payments?

4   A.   Okay.  See, this is more than a yes-or-no answer.

5   Q.   Well, I'm just asking if you thought about telling the

6   bank that?

7   A.   No, I did not.

8   Q.   Okay.  Now, just sort of moving on to your defense, I'd

9   like to move sort of into -- I just want to clarify your

10  position on your defense.

11          The first thing was, I believe you testified on

12  direct that you did a FOIA request in 2012, but then later you

13  were looking at the print date, which was May 2008.  I just

14  want to --

15  A.   I had -- I'm sorry.  Go ahead.

16  Q.   It was 2008; right?

17  A.   Yes.

18  Q.   And the -- the individual master file printouts that you

19  showed, there was -- there was a particular, I guess, code or

20  series of letters and numbers that you testified being

21  particularly important to you; is that right?

22  A.   Correct.

23  Q.   Would it be fair to say that there were tons of other

24  codes and numbers on the master file?

25  A.   Yes.

WILLIAM WALLER - CROSS

1    Q.   Would it be fair to say that the master file included

2    numbers about how much tax you owed?

3    A.   Yes.

4    Q.   And would it be fair to say that there were codes

5    explaining that the tax was assessed and things of that

6    nature?

7    A.   Yes.  But below that it also had amount due, zero.

8    Q.   So --

9         MR. MAGNANI:  Well, let me -- Mr. Becraft, do you

10   have the --

11        MR. BECRAFT:  I have the -- I have the hard copies,

12   Your Honor, here.

13        MR. MAGNANI:  Are they all here?

14        MR. BECRAFT:  I'm turning them over and haven't got

15   them organized right now, but I have no objection to the

16   prosecution taking this stack.

17     (Conferring with counsel.)

18        MR. BECRAFT:  The ones that were admitted?

19        MR. MAGNANI:  Yeah.

20        MR. BECRAFT:  Okay.  I'll do that favor for the

21   government, Your Honor.

22   BY MR. MAGNANI:

23   Q.   And the exhibits that Mr. Becraft showed you, they had a

24   bunch of things highlighted; right?

25   A.   Yes.

WILLIAM WALLER - CROSS

1    Q.   Okay.

2         **MR. MAGNANI:**  Yeah, that's -- I just want to see the

3    highlights.  That's all.

4    **BY MR. MAGNANI:**

5    Q.   Now, do you remember Kristy Morgan?

6    A.   I believe so.  She testified?  Yes.

7    Q.   And she was the lady from Ogden, Utah?

8    A.   Yes.

9    Q.   The one who worked for the IRS for 34 years?

10   A.   Yes.

11   Q.   And do you remember what she explained that code to mean?

12   A.   Yes.  She said that it was -- the IRS was not required to

13   send out the 1040 booklets, but what she failed to mention was

14   the 1040 was not required to be filed or sent in by me.  She

15   didn't -- she didn't say that much.  She said that that code

16   had to deal with the service center sending out the booklets,

17   but the other half says 1040 not required to be filed or

18   mailed.

19   Q.   Mr. Waller, I know you have a lot to say, but you

20   understand that, when I'm done --

21   A.   Okay.

22   Q.   -- Mr. Becraft, he can ask you to --

23   A.   Sorry.

24   Q.   -- elaborate on things that may be important to you.

25   A.   Sure.

WILLIAM WALLER - CROSS

1    Q.    So please just -- if you could keep to the agreement.

2          So -- and so was the answer that you did -- you do

3    know what she testified it meant?

4    A.    Yes.

5    Q.    And is it fair to say that her testimony of what it meant

6    is different than what you understood?

7    A.    Correct.

8    Q.    And as you sit here today, after hearing her testify and

9    talking about her 34 years of experience as a custodian of

10   records and her experience testifying in many trials,

11   including the Irwin Schiff trial, do you not think she's an

12   authoritative source on these matters?

13   A.    I'm sure she is.

14   Q.    But does it not change your position?

15   A.    Not at all.

16   Q.    Okay.  So as you sit here today, you still believe the

17   code in the computer manual means what -- the -- what you

18   explained?

19   A.    Yes.  It was actually transcribed by the IRS.  I didn't

20   do it.  It was -- the IRS sent it to me that way.

21   Q.    Okay.  I'm not asking if it was transcribed.  I'm just

22   asking if --

23   A.    Okay.  Sorry.

24   Q.    Now -- and Mr. Becraft, in opening, he said that the

25   defense was good faith.  Do you -- is that what you understand

WILLIAM WALLER - CROSS

1   your defense to be, a good-faith defense?

2   A.   Yes.

3   Q.   Meaning that you honestly believed -- and I guess still

4   honestly believe -- that you're not required to pay taxes?

5   A.   Correct.

6   Q.   Okay.  But it's not like good-faith reliance on your tax

7   lawyer; right?

8   A.   No.  It's on my own research.

9   Q.   And it's not a good-faith reliance on your CPA?

10  A.   Correct.

11  Q.   It's just your own research that you've done yourself and

12  you --

13  A.   Yes.

14  Q.   -- and you've concluded that you're not required to pay

15  tax?

16  A.   Yes.

17  Q.   So I guess, since you still believe it today, you don't

18  have any intention of filing a 2018 tax return before

19  April 15th?

20  A.   If somebody shows me the law that makes me liable, I'll

21  be happy to, and I'll be happy to pay my tax in full.

22  Q.   Okay.  And that's something that you've had that position

23  for a long time, if someone would show you the law, you'd be

24  happy to pay?

25  A.   Correct.

WILLIAM WALLER - CROSS

1    Q.   I believe you testified about putting your checkbook on

2    the table --

3    A.   That's right.

4    Q.   -- during --

5    A.   That's right.

6    Q.   Sorry.  It's just, Ms. McClane, she can't if we both talk

7    at the same time.  Just wait.

8            **MR. MAGNANI:**  Thank you, Mr. Becraft.

9    **BY MR. MAGNANI:**

10   Q.   Basically that you testified before that you had a

11   collections due process hearing in 2001 or '2?

12   A.   Yes.

13   Q.   And in that hearing you put your checkbook on the table

14   and you said, "If you can show me the law, I'd be happy to pay

15   in full"?

16   A.   Correct.

17   Q.   And, I mean, you're -- you understand the charges against

18   you, that you're being charged with tax crimes?

19   A.   Yes.

20   Q.   That doesn't influence your belief about whether the law

21   requires you to pay taxes?

22   A.   No.

23   Q.   Do you agree with me that the crimes that you're being

24   charged with are real crimes in the United States Code?

25   A.   Yes.

WILLIAM WALLER - CROSS

1    Q.   Okay.  Now, I think you said -- yesterday you said, when

2    you first heard Irwin Schiff, you wanted to go meet him to see

3    if it was true or if -- or if it was just an act for his radio

4    show.  Was that your testimony?

5    A.   Correct.

6    Q.   And I think you said that, within 45 minutes of meeting

7    him, you knew he was for real?

8    A.   Yes.

9    Q.   And you said it was important to you to find out if he

10   was for real because it could have a big impact on your life

11   if what he was saying was true?

12   A.   Yes.

13   Q.   And by a big impact on your life, did you mean that, if

14   you didn't have to keep on going on the way you had been

15   filing tax returns, you could save a lot of money in the

16   future?

17   A.   No.  I didn't look at it that way.  No.

18   Q.   Please explain.

19   A.   I looked at it as, if he was true and there was truly no

20   section in the code that makes me liable for the tax, then

21   that's something that I would be interested in.  It had

22   nothing to do with the possibility of making lots of money or

23   never having to pay tax.  It was just the fact -- it was

24   standing on the principle on whether or not it was true or

25   not.

WILLIAM WALLER - CROSS

1    Q.   So it's not about money for you; it's about the

2    principle?

3    A.   That's correct.

4    Q.   Okay.  Well, would you agree with me that this principle

5    that you believe in has -- has enriched your life in a

6    monetary sense?

7    A.   I think my work ethic has enriched my life in a monetary

8    sense.

9    Q.   Right.  But my question was whether this principle that

10   you believe in and the fact that you haven't filed or paid

11   taxes in 20 years, I'm asking you if that has enriched your

12   life or not.

13   A.   Sure.

14   Q.   Okay.  And you would agree with me that some of that

15   money, about $700,000, is extinguished now, and so certainly,

16   at least to the tune of $700,000, your life has been enriched?

17   A.   Sure.

18   Q.   Okay.  About good faith, you talked about how -- I

19   think -- and again, please, if I'm misquoting you.  You said

20   that you always accepted your mail from the IRS?

21   A.   Yes.

22   Q.   You said, if you don't accept your mail, that's where you

23   get in trouble?

24   A.   Yeah.

25   Q.   Okay.  You accepted that mail in good faith?

WILLIAM WALLER - CROSS

1    A.   Yes.

2    Q.   And is it your testimony that you got all of the mail the

3    IRS sent to you with the exception of one very important

4    document?

5    A.   I believe so.  I have received every single certified

6    mail I've ever gotten.

7    Q.   And that mail -- you heard Ms. Rikke testify; right?

8    A.   Yes.

9    Q.   And she was cross-examined about the mail system?

10   A.   Um-hum.

11   Q.   Okay.

12   A.   Yes.  I'm sorry.  Yes.

13   Q.   And she said that the package was never received by you;

14   right?

15   A.   Correct.

16   Q.   You agree with that?

17   A.   That's correct.

18   Q.   It was unclaimed?

19   A.   It was never received, that's right.

20   Q.   My question is if it was unclaimed.

21   A.   Well, I don't know -- I don't know if it was unclaimed or

22   undeliverable.  There's a sticker on there that says, "Route

23   undefined."  I don't know.

24   Q.   Is there a stamp on there that says, "Unclaimed"?

25   A.   I don't -- no, I didn't see that.  I saw a "U" with a

WILLIAM WALLER - CROSS

1    finger pointing to the address.

2    Q.   Do you know what the post office witness that you

3    intended to call would have said about that finger with the

4    "U"?

5    A.   We were told it was undeliverable, route un -- undefined.

6    We tried to subpoena them, and they didn't show.

7    Q.   Now, you've never had trouble getting mail at your house

8    before you said?

9    A.   Correct.

10   Q.   And you said that, when certified mail came, if you were

11   home, you accepted it?

12   A.   Correct.

13   Q.   But if you weren't home, they'd leave a note; right?

14   A.   That's right.

15   Q.   And then you would go to the post office and pick it up?

16   A.   Correct.

17   Q.   I believe you said -- did you say -- and that happened

18   regularly?  You went to the post office pretty regularly to

19   pick up mail?

20   A.   Well, there was some periods of time, yeah, where there

21   was quite a few, yes.

22   Q.   Now, you were showed Exhibit 176, which we can pull up.

23   It's in evidence.  The jury can -- this was -- and I know you

24   haven't seen it.  Okay.

25        This was your collections due process request; right?

WILLIAM WALLER - CROSS

1    A.   Yes.

2    Q.   And then you also talked about 178 --

3        MR. MAGNANI:  Which you can pull up, Ms. Burgess.

4    BY MR. MAGNANI:

5    Q.   You testified that this was your denial of the

6    collections due process?

7    A.   The notice of determination?

8    Q.   Yes.

9    A.   Yes.

10   Q.   Okay.  I'd like to ask you about Exhibit 177.  You

11   mentioned Michael Freitag during your -- during your

12   examination.  He was the appeals officer handling this

13   request; right?

14   A.   Correct.

15   Q.   And his name's on -- on this exhibit?

16   A.   Yes.

17   Q.   Yeah.  And this was one of the pieces of mail that

18   fortunately you did get; right?

19   A.   Yes.

20       MR. MAGNANI:  If we could please go to the next page

21   of this exhibit, and can you zoom in on the enclosures

22   section, please?

23   BY MR. MAGNANI:

24   Q.   Now, Mr. Waller, this was not the first time the IRS sent

25   you "The Truth About Frivolous Tax Arguments;" is that right?

WILLIAM WALLER - CROSS

1    A.    Correct.

2    Q.    And so you've seen that publication before?

3    A.    Yes.

4    Q.    And it was sent along with -- with this letter?

5    A.    Yes.

6          **MR. MAGNANI:**  I'm going to apologize to the deputy.

7    I have a copy of that, and it -- I have not given it to you

8    yet, but I have it marked.

9          Can I approach the witness?

10         **THE COURT:**  Yes, sir.

11         **MR. MAGNANI:**  Okay.  And just for the record, I'm

12   going to give a copy to counsel, and I'll approach the bench,

13   if that's okay, if you want a copy, Judge?

14         **THE COURT:**  No, sir.  No, that's fine.

15         **MR. MAGNANI:**  And just for the record, I've marked

16   this for now as Exhibit 195.

17         **THE DEFENDANT:**  Thank you.

18         **MR. MAGNANI:**  And Mr. Vaglio, if I could have the

19   ELMO, please?  So this is -- I'm sorry.  Actually Ms. Burgess

20   has it.

21         **COURTROOM ADMINISTRATOR:**  Okay.

22         **MR. MAGNANI:**  I didn't realize she already got it

23   loaded up.  So -- and this has not been admitted yet, so if it

24   could be just for the witness at this time.  Well --

25   ///

WILLIAM WALLER - CROSS

1    **BY MR. MAGNANI:**

2    Q.   Mr. Waller, you're familiar with this document; right?

3    A.   Yes.

4    Q.   It's been sent to you before?

5    A.   Yes.

6    Q.   Sent by -- sent by the IRS?

7    A.   Yes.

8         **MR. MAGNANI:**  I'd move to admit Exhibit 195.

9         *(Government Exhibit No. 195, offered.)*

10        **THE COURT:**  Any objection?

11        **MR. BECRAFT:**  No objections to 195, Your Honor.

12        **THE COURT:**  The same will be admitted and may be

13   published.

14        *(Government Exhibit No. 195, received.)*

15   **BY MR. MAGNANI:**

16   Q.   Fair to say this is a 60-page document sent by the IRS

17   that addresses what at least the -- I understand they may not

18   be frivolous to you but what the IRS has considered frivolous

19   arguments?

20   A.   Yes.

21   Q.   And could you please tell the jury what's the first

22   section of this argument -- of this mailer about?

23   A.   Frivolous tax arguments in general.

24   Q.   And can you please tell the jury what (a), the first

25   section, is about?

WILLIAM WALLER - CROSS

1    A.   The voluntary nature of the federal income tax system.

2    Q.   Did you read this document?

3    A.   Years ago, yes.

4    Q.   And would you agree with me that, you know, without

5    paging through the whole thing, that it includes numerous

6    court cases?

7    A.   Yes.

8    Q.   And did you read those cases?

9    A.   No.

10   Q.   Okay.  Would you agree with me that it quotes numerous

11   sections of the code?

12   A.   Yes.

13   Q.   Did you read those sections of the code?

14   A.   I've read many sections of the code, yes.  Yes.

15   Q.   Well, I guess my question, though, is:  Did you read the

16   sections of the code that are cited in the section about the

17   voluntary nature of the federal income tax system?

18   A.   I did years ago, yes.

19   Q.   Okay.  And neither of those cases, nor the sections of

20   the code that the IRS pointed you to, those didn't change your

21   opinion?

22   A.   No, because they're not liability sections.

23   Q.   So just broadly, I mean, you used to be in the Air Force;

24   right?

25   A.   Correct.

WILLIAM WALLER - CROSS

1   Q.   So you're aware that the military is a big, expensive --

2   it's not a branch of government, but that it costs a lot of

3   money to run the military?

4   A.   Sure.

5   Q.   You worked with fighters, bombers, ordinants, that type

6   of thing?

7   A.   Correct.

8   Q.   And where -- well, where did the money that paid your

9   paycheck come from when you worked in the Air Force?

10  A.   From the Federal Reserve.

11  Q.   And do you know how the Federal Reserve got that money?

12  A.   It was loaned to the government by the Federal Reserve.

13  Q.   Well, let me ask you this question.  You used to pay

14  taxes; right?

15  A.   Correct.

16  Q.   And is it true that most people you know pay taxes?

17  A.   Most?  Yes.

18  Q.   Your wife pays taxes?

19  A.   Yes, she does.

20  Q.   And do her three -- your three stepsons pay tax?

21  A.   Yes.

22  Q.   And are you aware that that tax money goes to pay for

23  things like the military?

24  A.   No.  It goes to the -- it goes to the debt.

25  Q.   Okay.

WILLIAM WALLER - CROSS

1    A.    Not a dollar of it goes to the military.

2    Q.    Okay.  So all the -- the tax money that's paid by

3    everyone in this country, it's your testimony that that money

4    does not go to anything other than debt?

5    A.    Correct.

6    Q.    Okay.  Now, after -- now, when you were in the Air Force,

7    you received training; right?

8    A.    Yes.

9    Q.    And after you left that Air Force, you brought your

10   skills to the private sector?

11   A.    Correct.

12   Q.    You worked for a number of defense contractors?

13   A.    Yes.

14   Q.    And this was still during the time that you were a

15   taxpayer?

16   A.    Yes.

17   Q.    Okay.

18   A.    Correct.

19   Q.    And I think you said -- what was the job you were working

20   when you were -- I think it was 15 when you first started

21   paying taxes?

22   A.    The job when I was 15?

23   Q.    Yeah.

24   A.    I believe I was a dishwasher at a Best Western.

25   Q.    Okay.  And so from 1981 until 1997, you filed tax returns

WILLIAM WALLER - CROSS

1    and paid taxes?

2    A.   Correct.

3    Q.   And you used to get refunds; right?

4    A.   Well, I paid in a lot more than I got back in a refund,

5    yes.

6    Q.   So the answer's "yes"?

7    A.   Yes.

8    Q.   Okay.  When you became a broke -- an agent, that changed;

9    right?  No more refunds?

10   A.   Correct.

11   Q.   The -- in 1994 and 19 -- from '94 through '96, you were

12   just getting started in real estate; right?

13   A.   Yes.

14   Q.   Is it fair to say that in those years you owed very

15   little tax at the end of the year?

16   A.   Yes.

17   Q.   Because you were just starting and you weren't -- and you

18   weren't as successful of a real estate agent at that time?

19   A.   Yes.

20   Q.   And fair to say, in 1997, you were much better at it than

21   you were when you started in '94?

22   A.   Yes.  '94 it was just -- it was part time.

23   Q.   And '95 and '96, still not making much money at it?

24   A.   It was still -- the main focus of my job at that time was

25   remodeling homes.  I only got the real estate license so we

WILLIAM WALLER - CROSS

1    could sell our properties that we had ready to go.

2    Q.   So 1997, the amount of tax that you had to pay at the end

3    of that year was much more than you'd ever paid before when

4    filing a tax return; right?

5    A.   I believe so, yes.

6    Q.   Would it be fair to say that you didn't like having to

7    cut such a big check to the IRS at the end of that year?

8    A.   Sure.  Yes.

9    Q.   Would it be fair to say that you thought it was unfair?

10   A.   No, I wouldn't say that.

11   Q.   So you thought it was fair?

12   A.   At the time I thought I was liable to pay.  So whatever

13   the fair share was, that's what I paid.  I wouldn't say it was

14   unfair.

15   Q.   Well, let me ask you this.  You said a man approached you

16   at -- was it -- it was Charleston, and what was the

17   intersection?

18   A.   Fort Apache.

19   Q.   Okay.  And he shoved a tape through your car window?

20   A.   Yes.

21   Q.   All right.  And you started listening to Irwin Schiff on

22   the radio?

23   A.   That minute, yeah.  Yes.

24   Q.   And you said that was in 1997; right?

25   A.   Yes.

WILLIAM WALLER - CROSS

1    Q.    Okay.  But you didn't pay your taxes for 1997 until 1998;
2    right?
3    A.    I believe so, yeah.
4            MR. MAGNANI:  Could we have Exhibit 496, please?
5    BY MR. MAGNANI:
6    Q.    Would you agree that your 1997 tax return was filed in
7    July 6th, 1998?
8    A.    Yes.
9    Q.    So would you agree that at least seven months after that
10   incident you paid $16,000 in tax?
11   A.    Oh yeah.  I didn't -- I didn't jump right in until at
12   least a year and a half.  I studied for a year and a half
13   before I took the plunge, yes.
14   Q.    But having been exposed to this kind of material for
15   seven months, would it be fair to say you were pretty mad
16   about having to write -- I mean, $16,000, that's -- that's
17   more than a third of your adjusted gross income for that year?
18   A.    Yes.
19   Q.    Do you believe the tax laws are constitutional?
20   A.    Yes, I do.  I believe they're misapplied.  But, yes, they
21   are constitutional.
22   Q.    And so -- and so just I want to make sure I understand.
23   So you think the statutes were properly passed by Congress?
24   A.    Yes.
25   Q.    But you just think they're interpreted wrong?

WILLIAM WALLER - CROSS

1    A.    They're applied wrong.

2    Q.    What's the difference between applied and interpreted?

3    A.    Well, I guess -- I guess they would be similar.

4    Q.    Okay.  So when you say that the -- when you say that your

5    understanding is that the tax laws are voluntary, is it kind

6    of like how it's voluntary to -- to give to a charity or

7    something?

8    A.    No.  It's voluntary in the sense that, if you are subject

9    to the tax, it is not voluntary to you.

10   Q.    Okay.  And you would agree with me that a levy is an

11   involuntary taking of property; right?

12   A.    Yes.

13   Q.    And that the IRS sometimes takes -- satisfies tax debts

14   through a levy?

15   A.    Yes.

16   Q.    And that's not voluntary; right?

17   A.    Correct.

18   Q.    Okay.  Now, you -- you went over -- and these are in

19   evidence -- a bunch of exhibits.  It was 501 through 505.  Do

20   you remember those?

21   A.    Not particularly, no.

22   Q.    Those are the -- the newspaper articles that you --

23   A.    Oh yes.

24   Q.    And there were -- there were a lot of sections

25   underlined?

WILLIAM WALLER - CROSS

1    A.   Yes.

2    Q.   And fair to say that the underlined sections are the

3    sections that were important to you?

4    A.   Correct.

5         MR. BECRAFT:  Your Honor, I have those exhibits right

6    here if he would tell me which ones?

7         MR. MAGNANI:  That's okay.  These are electronically

8    available?

9         MR. BECRAFT:  Well --

10        MR. MAGNANI:  No?  Okay.

11   BY MR. MAGNANI:

12   Q.   Now, you underlined many times -- I think you said -- one

13   of them you said it says no less than seven times that -- the

14   word "voluntary;" is that right?

15   A.   Yes.

16   Q.   And that one was --

17   A.   I believe it was Jerome Kurtz, the IRS commissioner.

18   Q.   I believe you're right, sir.

19        MR. MAGNANI:  And if we could please pull up

20   Exhibit 504?  And if it's not available on the computer --

21   I've got notes all over mine so...

22        MR. BECRAFT:  The copies that were admitted are right

23   here, Your Honor.

24        MR. MAGNANI:  Thank you.  Thank you, Mr. Vaglio.

25   ///

WILLIAM WALLER - CROSS

1    **BY MR. MAGNANI:**

2    Q.    Okay.  So this is one of the ones that you underlined, I

3    believe you said, seven times that it says "voluntary"?

4    A.    Yes.

5    Q.    Can you please read the three words after "voluntary"?

6    A.    Voluntarily -- voluntarily obeyed the laws.

7    Q.    And, sir, do you consider yourself a law-abiding citizen?

8    A.    Yes, I do.

9    Q.    You obey the laws?

10   A.    Yes, I do.

11   Q.    Do you obey the laws voluntarily?

12   A.    No.  They're mandatory.

13   Q.    Well, let me ask you this.  If no one's -- well, remember

14   when those high school kids were in here?

15   A.    Yes.

16   Q.    If one of them stood up and started screaming and

17   Judge Mahan banged on the -- you know, banged on the gavel and

18   said, "Order.  Be quiet," that kid could voluntarily be quiet;

19   right?

20   A.    Yes.

21   Q.    If he didn't -- well, if there was a marshal here, a

22   marshal might have taken --

23            **THE COURT:**  The marshal just left.

24            **THE DEFENDANT:**  With a kid.

25   ///

WILLIAM WALLER - CROSS

1    **BY MR. MAGNANI:**

2    Q.   Yeah.  The marshal could force that -- that student to

3    comply with the law by removing him from the court?

4    A.   Yes.

5    Q.   Okay.  So no one's forcing you not to rob banks; right?

6    A.   Correct.

7    Q.   You voluntarily don't rob banks; right?

8    A.   Correct.

9    Q.   In that context, you voluntarily obey the laws of this

10   country?

11   A.   Yes.

12   Q.   Okay.  Now, you've studied civics at all?

13   A.   Back in high school.

14   Q.   Well, you've been a student of at least some types of

15   laws, I mean, for 20 years; right?

16   A.   Sure.

17   Q.   So are you vaguely familiar of, like, the branches of

18   government?

19   A.   Yes.

20   Q.   Okay.  Congress writes the laws; right?

21   A.   Yes.

22   Q.   The Executive Branch enforces the law?

23   A.   Correct.

24   Q.   Sorry.  You have to say --

25   A.   Yes.

WILLIAM WALLER - CROSS

1   Q.   And the Judicial Branch, it's their job to interpret the
2   law?
3   A.   Yes.
4   Q.   And so you know that you can't just interpret laws
5   however you want; right?
6   A.   Correct.
7   Q.   That the final say is going to be someone in robes;
8   right?
9   A.   Yes.
10  Q.   Okay.  And I just want to talk about -- I know we talked
11  about the Burbank accounts before.  I just want to talk about
12  other things -- other types of property.
13       Would you agree with me that, besides your home, you
14  don't own any assets in your name?
15  A.   I don't own anything else other than my home, yes.
16  Q.   Well, you have a Lexus and a Mercedes; right?
17  A.   My wife has a lease on a Mercedes, yes.  I have a Lexus.
18  Q.   So is the answer yes, you have a Lexus?
19  A.   Yes.
20  Q.   Okay.  The Lexus is in your wife's name?
21  A.   No, it's in -- I believe it's in Scottsdale --
22  Scottsdale United --
23  Q.   It's not in your name; right?
24  A.   No.
25  Q.   And do you understand that, if -- if things are in your

WILLIAM WALLER - CROSS

1   name, whether it's a bank account or a car, that the IRS could

2   take it because they believe you owe taxes?

3   A.   Yes.

4   Q.   And you know that, even though you disagree, the IRS'

5   position is that you do owe taxes; right?  You know that?

6   A.   Yes.

7   Q.   Okay.  Do you know what the courts -- and when I say

8   "courts," I just mean broadly United States courts -- do you

9   know what their position is on the tax laws and whether people

10  are liable to pay income tax if they earn over a certain

11  amount?

12  A.   Yes.

13  Q.   And do you know that their position is that, if a person

14  earns over a certain amount of income, they are -- they are

15  required to pay taxes?

16  A.   That's the way they're applying it, yes.

17  Q.   And -- and when you say "they," you mean the

18  United States courts; right?

19  A.   Yes.

20  Q.   Okay.  Fair to say you disagree with the way they're

21  applying it?

22  A.   Yes.

23  Q.   You disagree, that's your testimony?

24  A.   Disagree with?

25  Q.   The way the courts are applying the law.  I just want to

WILLIAM WALLER - CROSS

1   make sure you want to stick with that answer, Mr. Waller.

2   A.   Well, ask the question again.

3   Q.   You disagree with the way the courts are applying the

4   law?

5   A.   I'm saying I dis -- I disagree with the way the laws are

6   being applied, whether it's the court, whether it's the IRS.

7   The tax laws are written fine.  It's the way --

8   Q.   No.  Remember, Mr. Becraft can ask you to explain later.

9           Right now my question is:  Do you disagree with the

10  way the United States courts apply the tax law?

11  A.   I'm going to say no.

12  Q.   You don't disagree?  A minute ago you just said you

13  disagreed.  I just want to make sure if you want to keep that

14  answer, sir.

15  A.   You know, I do want to keep it because I think it is

16  being misapplied.

17  Q.   Okay.  And just for the record's sake, you think it's

18  being misapplied by the IRS?

19  A.   Yes.

20  Q.   And it's being misapplied by the United States courts?

21  A.   Yes.

22  Q.   You testified before about entities that you created in

23  Nevada and Montana?

24  A.   Yes.

25  Q.   You said the Montana one you never used, but you just

WILLIAM WALLER - CROSS

1    registered it because you thought you might do business in

2    Montana?

3    A.    We were going to do some land acquisitions up there, yes.

4    Q.    Didn't you also use that Montana entity to -- didn't you

5    list that Montana entity as an officer of a Nevada entity

6    called GB Holdings?

7    A.    I believe so, yes.

8    Q.    So when you say you didn't use it, you just mean you

9    didn't use it for real estate development in Montana --

10   A.    Yeah.  Well, the purpose of creating it, we didn't use

11   it.

12   Q.    You opened a lot of P.O. boxes for those entities?

13   A.    No.  Just the one in Montana, and one here in Nevada.

14   Q.    Okay.  But you didn't use your home address for these

15   entities?

16   A.    No.

17   Q.    Would you agree that you used a lot of cash between 2007

18   and 2017?

19   A.    Yes.

20   Q.    Okay.  And there was an exhibit that -- do you remember

21   the exhibit that Ms. Rikke showed that --

22   A.    Yes.

23   Q.    -- was about $700,000 in cash?

24   A.    Yes.

25   Q.    Okay.

WILLIAM WALLER - CROSS

1          **MR. MAGNANI:**  Can we go back to the computer, please,

2     Mr. Vaglio?

3               If we can go to Exhibit 153, Ms. Burgess.

4     **BY MR. MAGNANI:**

5     Q.   And this was one of the ones I was asking you before,

6     Mr. Waller.

7          **MR. MAGNANI:**  So page 1, if you could zoom to the

8     last paragraph, I believe it is.

9     **BY MR. MAGNANI:**

10    Q.   Now, this was -- and I'm sorry because you don't see the

11    top anymore, but do you remember if this was the letter you

12    wrote to Ginger Wray?

13    A.   I don't -- can you scroll up?

14    Q.   Sure.  Yeah, if you could --

15    A.   Yes.

16    Q.   Okay.  And in the bottom -- and you basically -- is it

17    fair to say that, if she didn't do what you were asking her to

18    do, you would file a complaint in the Treasury Inspector

19    General's Office seeking termination of her employment?

20    A.   Yes, because -- yes.

21    Q.   Okay.  And you remember Ms. Wray from before when she

22    testified?

23    A.   Yes.

24    Q.   Okay.  She's the -- fair to say that you took exception

25    to at least one thing that she said?

WILLIAM WALLER - CROSS

1    A.    Yes.

2    Q.    Do you remember what that thing was that you took

3    exception to?

4    A.    I thought you meant in regards to this letter.  On her

5    testimony?  No.

6    Q.    I'm asking -- yeah.  Do you remember she said something

7    about -- you said on direct something about how your wife's

8    probably only shopped at Neiman Marcus once or twice.

9    A.    Oh.  Yeah.  Yes.

10   Q.    And Ms. Wray said something different; right?

11   A.    Yes.

12   Q.    And you take exception to that?

13   A.    It was inaccurate.  Yeah.

14   Q.    Okay.  And Ms. Wray, she was the -- she's retired now.

15   She came here from Florida; right?

16   A.    Yes.

17   Q.    She was the one who testified that it was a summons that

18   brought her here?

19   A.    Yes.

20   Q.    Now, it is true that your wife had a Nordstrom credit

21   card and spent thousands of dollars on it?

22   A.    A Nordstrom credit card, yes.

23   Q.    Okay.  And Nordstrom and Neiman Marcus are both

24   department stores that start with "N"?

25   A.    Yes.

WILLIAM WALLER - CROSS

1    Q.    And would you forgive Ms. Wray if she made a mistake in

2    her testimony about that?

3    A.    Yeah.  If it was a true mistake, sure.  Yes.

4    Q.    But you're saying you don't believe it was a true

5    mistake?

6    A.    Well, that's not what she said.  She said Neiman Marcus,

7    so I don't know.

8    Q.    Okay.  But I'm just asking you, do you think this woman,

9    who's retired and who came here from Florida on a summons --

10   A.    Yes.

11   Q.    -- who's never met you before -- I just want to

12   understand if you think that this is all people conspiring

13   against you, or if you think she just made a mistake?

14   A.    I think she probably made a mistake.

15   Q.    Okay.

16        MR. MAGNANI:  If we could please go to page 5 of this

17   exhibit.

18        MR. BECRAFT:  I didn't hear the exhibit number.

19        MR. MAGNANI:  Oh.  It's 153, the same exhibit.

20   BY MR. MAGNANI:

21   Q.    And this was to Revenue Officer Soto; right?

22   A.    Yes.

23   Q.    And he's -- he also came out of retirement to come here

24   pursuant to a summons to testify in this case?

25   A.    Right.

WILLIAM WALLER - CROSS

1    Q.    And he testified he couldn't pick you out of a lineup;
2    never met you?
3    A.    Correct.
4    Q.    In this letter, did you sort of make a similar threat to
5    go to the Treasury Inspector General's Office and seek his
6    termination if he didn't do what you wanted?
7    A.    If he didn't do the right thing, yes.
8    Q.    Okay.  And you mentioned Debra Beckwith (phonetic) before
9    at Century 21?
10   A.    Yes.
11   Q.    And you called her and demanded that she not -- because I
12   think you said it was a violation of your agreement with Red
13   Wallin --
14   A.    Right.
15   Q.    -- if she complied with the summons?
16   A.    Right.  I had administrative actions that would take
17   place first before they would turn over any records.
18   Q.    And fair to say that you also called someone at
19   Community Bank and you told them -- and you threatened them
20   not to comply with the -- was it a summons or a levy?
21   A.    I believe that was a levy, yeah.
22   Q.    Okay.  When -- when the -- when you got those grand jury
23   subpoenas for all your entities, you originally wrote to the
24   U.S. Attorney's Office asking for more time to respond; right?
25   A.    I believe so, yes.

WILLIAM WALLER - CROSS

1   Q.   You asked for about a couple months' more time to

2   respond?

3   A.   Yes.

4   Q.   Okay.  But then ultimately you refused to comply?

5   Remember the exhibit we looked at before?

6   A.   Right.

7   Q.   And is that right, that you ultimately did not comply

8   with the subpoena and produce the documents that were

9   requested from Burbank Holdings?

10  A.   There was no documents, yes.

11  Q.   There are no Burbank Holdings documents?

12  A.   Well, all the other entities.  That was the reason I

13  wrote them.

14  Q.   Well, I'm asking about Burbank Holdings.

15  A.   The only documents for Burbank Holdings is the LLC and

16  two or three or four bank accounts, correct.

17  Q.   Can you remind us what year you married Ms. Bonifatto.

18  A.   2001.

19  Q.   Okay.  And so, by then, you were a non-filer; right?

20  A.   Yes.

21  Q.   But she filed every year; right?

22  A.   I believe so.

23  Q.   She used a return preparer to file?

24  A.   I believe so, yes.  I'm not sure.

25       **MR. MAGNANI:**  Can we please go to Exhibit 6?  And

WILLIAM WALLER - CROSS

1    this is in evidence.  Could you go to page 4, please?  Page 5.

2              Can you please zoom in?

3  **BY MR. MAGNANI:**

4    Q.   Do you see where it says, "Paid preparer use only,"

5    Mr. Waller?

6    A.   Yes.

7    Q.   Do you know who Katherine Hindrichs is?

8    A.   No, I don't.

9    Q.   Could it be your wife's return preparer at least for that

10   year?

11   A.   Yeah, I think that's what it is.  I don't know who she

12   is.

13   Q.   Your wife now receives social security; right?

14   A.   Correct.

15   Q.   About $9,500 a year?

16   A.   I guess.  I don't know.

17   Q.   Well, do you remember when Ms. Morgan testified about the

18   IRP data?  Do you remember what IRP data is?

19   A.   Vaguely, yeah.

20   Q.   Okay.  Do you remember the testimony about how the Social

21   Security Administration reported paying her I believe it was

22   around $9,500 the last few years?

23   A.   I believe so, yeah.  I just know it's like

24   600-and-something a month, yeah.

25   Q.   Okay.  So -- so you know the checks just come in every

WILLIAM WALLER - CROSS

1   month; you just --

2   A.   Right.

3   Q.   -- don't know the total?  Okay.

4        Do you pay social security tax?

5   A.   No, I don't.

6   Q.   Why not?

7   A.   Because nobody's withholding.

8   Q.   But self-employed people are required to pay social

9   security tax; right?

10  A.   If you're liable for the tax, yeah.

11  Q.   And you did file tax returns from 1994 through 1997 when

12  you were working as a self-employed person; right?

13  A.   Correct.

14  Q.   And isn't it true that a self-employed person actually

15  has to pay double the social security tax because they have to

16  pay the employer's side and the employee's side?

17  A.   Yes.

18  Q.   Okay.  And so, I'm sorry, can you please just say again

19  why haven't you paid social security tax from 1998 on?

20  A.   Because that's still part of the filing requirement.  If

21  I'm not -- if I'm not required to file, I'm not required to

22  report, not required to pay.

23  Q.   Okay.  So -- okay.  But your wife does file and pay.  I

24  think you said before you stepchildren, they file and pay?

25  A.   Yes.  They all choose to, yes.

WILLIAM WALLER - CROSS

1    Q.   Your father files and pays?

2    A.   Yes.

3    Q.   Your co-workers at Century 21 file and pay?

4    A.   Yes.

5    Q.   The -- do you remember Billie Kohlman and Jimmy Dague's

6    testimony?

7    A.   Yes.

8    Q.   Do you remember them both testifying that they gave their

9    materials to an accountant at the end of the year?

10   A.   Yes.

11   Q.   Do you remember when Louis Gentile testified?

12   A.   Yes.

13   Q.   He said the same thing?

14   A.   Yes.

15   Q.   In fact, he -- he confessed to making an error on earlier

16   tax returns with regard to rental -- rental home income;

17   right?

18   A.   Yes.

19   Q.   Okay.  But his accountant worked that out, and then he

20   paid the back taxes?

21   A.   Yes.

22   Q.   Your clients pay taxes?

23   A.   Most of them do, yes.

24   Q.   Would you agree with me that, in your community of

25   colleagues and clients and families, your view is somewhat of

WILLIAM WALLER - CROSS

1    an outlier view?

2    A.    Actually, on the closer circle, less than on the fringe,

3    I would say there's probably more people that are like-minded

4    with me on the inside than on the outside.

5    Q.    What do you mean like you on the inside than --

6    A.    Some of my closer friends are also non-filers.

7    Q.    Can you please tell me their names?

8    A.    No.

9    Q.    Do you want the judge to order you to tell me their

10   names?

11         Sir, you're familiar with the laws; right?

12   A.    Yes.

13   Q.    And you're familiar that you have a right not to

14   incriminate yourself; right?

15   A.    Yes.

16   Q.    And you know that you waived that right when you came to

17   testify; right?

18   A.    Yes.

19   Q.    And do you know that you don't have a right not to answer

20   questions about other people?

21   A.    Yes.

22   Q.    Okay.  So I would like the names, please, of the people

23   that you know that you consider close friends that don't file

24   tax returns.

25   A.    I believe one of them is right here in the room.  Peymon

WILLIAM WALLER - CROSS

1    Mottahedeh.

2    Q.   Who else?

3    A.   I think that's all I know.

4    Q.   So it's your testimony that you only know one person that

5    doesn't file tax returns?

6    A.   I know others on a first-name basis from different groups

7    and seminars.

8    Q.   Did you say something about a close circle that, when you

9    come close, people close to you, a lot of them are non-filers?

10   A.   Some of them, yeah.

11   Q.   So who, besides Peymon Mottahedeh, is close to you --

12   A.   He's the only one I can think of.

13   Q.   Sir, you understand that you're obligated to answer the

14   questions truthfully?

15   A.   I am answering them truthfully.

16   Q.   Okay. So --

17   A.   The others are first names.

18   Q.   I just want to make sure that it's your truthful

19   testimony that there's only one person that you know the first

20   and last name of that doesn't file tax returns besides

21   yourself?

22   A.   Correct.

23   Q.   Okay.  So to my original question, fair to say, among the

24   people that you know and that are close to you, your friends,

25   your acquaintances, your business associates, your clients,

WILLIAM WALLER - CROSS

1    your family, fair to say that, among those people, your view

2    is an outlier view?

3    A.    Yes.

4    Q.    Now, in regards to the view, you said that -- you know

5    that, in this case, the United States has to prove that you

6    actually owed taxes for 2004 through 2009; right?

7    A.    Correct.

8    Q.    And you don't believe that you owe taxes; right?

9    A.    Correct.

10   Q.    But you do agree that you earned the commissions that we

11   talked about before in all those years?

12   A.    Yes.

13   Q.    And so do you think, at the end of this trial, the judge

14   is going to say that maybe he doesn't owe taxes based on that

15   income, maybe he does, or do you think you know that he's

16   going to say, If he earned that income, he owed taxes?

17   A.    The judge will probably say that I owe the taxes, yes.

18   Q.    Okay.  And fair to say that's what judges all over this

19   country do?

20   A.    Yes.

21   Q.    And that's why people get convicted of tax crimes?

22   A.    And there's some that don't, yes.

23   Q.    Well, let me ask you, have you heard of Michael Cohen?

24   A.    Yes.

25   Q.    Have you heard of Paul Manafort?

WILLIAM WALLER - CROSS

1    A.   Um-hum.

2    Q.   You have to say "yes."  Sorry.

3    A.   Yes.

4    Q.   Have you heard of Al Capone?

5    A.   Yes.

6    Q.   Wesley Snipes?

7    A.   Yes.

8    Q.   Pete Rose?

9    A.   Yes.

10   Q.   Fair to say that these folks were all of greater

11   financial means than you?

12   A.   Yeah.  And I believe they were all filers lying on their

13   returns or --

14   Q.   You believe Wesley Snipes was a filer?

15   A.   I believe he was until he got involved with -- I forget

16   the name of the organization, but most of those were filers.

17   Q.   So let me understand your position.  If you file, you owe

18   tax, but if you don't file, you don't owe tax?

19   A.   The ones that get in trouble for the most part are the

20   ones that are filing returns, confessing what they owe, and

21   then their deductions and everything are not adding up.

22   Q.   Okay.  Well, let me ask you this.  Al Capone was

23   convicted of tax evasion; right?

24   A.   Um-hum.

25   Q.   Mike -- sorry.  You have to say "yes."

WILLIAM WALLER - CROSS

1  A.   Yes.  I'm sorry.

2  Q.   Michael Cohen, convicted of tax evasion; right?

3  A.   Yes.

4  Q.   Fair to say that you're charged with tax evasion?

5  A.   Right.

6  Q.   And that tax evasion, as we just discussed, requires the

7  government to prove that the person owes tax?

8  A.   Correct.

9  Q.   Okay.  So these people -- and I'm sorry.  I don't know if

10 I got the answer.  These people all were of greater financial

11 means than you?

12 A.   Yes.

13 Q.   Fair to say they could afford to buy great legal defense?

14 A.   Yes.

15 Q.   Okay.  Now, are you saying that you, William Waller, real

16 estate broker, that you found some law that the defense teams

17 for Paul Manafort, Michael Cohen, Pete Rose, Wesley Snipes,

18 and Al Capone, that all of their lawyers could not muster how

19 to persuade the courts to accept; is that what you're saying,

20 you found the Holy Grail, sir?

21 A.   I can't answer that for them, no.

22 Q.   You can only answer it for you?

23 A.   Correct.

24       **THE COURT:**  Is this a good stopping point?

25       **MR. MAGNANI:**  Yes, Your Honor.

WILLIAM WALLER - CROSS

1          **THE COURT:**  All right.  Let's take our noon recess.

2          During this recess, I again admonish you not to

3     discuss this case among yourselves or with anyone else; not to

4     listen to, read, or watch any report of or commentary on the

5     trial, by any person connected with the trial, or by any

6     medium of information, including, without limitation,

7     newspaper, television, radio, or the Internet.

8          And you are not to form or express an opinion on any

9     subject connected with this case until it's finally submitted

10    to you, under instructions from me, for your deliberations.

11          So we'll be in recess until 1:30.

12          **COURTROOM ADMINISTRATOR:**  All rise.

13     *(Jury out at 11:58 a.m.)*

14     *(Lunch recess at 11:58 a.m., until 1:35 p.m.)*

15     *(Jury in at 1:35 p.m.)*

16          **COURTROOM ADMINISTRATOR:**  All rise.

17          **THE COURT:**  All right.  Thank you.  You may be

18    seated.

19          Do the parties stipulate to the presence of the jury

20    and the alternates?

21          **MR. BECRAFT:**  We do, Your Honor.

22          **MR. MAGNANI:**  Yes, Your Honor.

23          **THE COURT:**  All right.  Mr. Waller, I remind you

24    you're still under oath.

25          **THE DEFENDANT:**  Yes, sir.

WILLIAM WALLER - CROSS

1          **THE COURT:**  All right.  You may resume the

2     examination, Mr. Magnani.

3               **MR. MAGNANI:**  Thank you, Your Honor.

4               **THE COURT:**  Yes, sir.

5     BY MR. MAGNANI:

6     Q.   Now, Mr. Waller, you've testified that the -- one of the

7     principal people you relied on was Irwin Schiff; is that

8     correct?

9     A.   That's correct.

10    Q.   And I believe we were talking before, he's the one that

11    you were introduced to first by radio in 1997?

12    A.   Yes, that's right.

13    Q.   And was it also -- in 1997, was that the year you met him

14    also?

15    A.   Yes, it was.

16    Q.   Now, are you aware now that Mr. Schiff was convicted of

17    willful failure to file tax returns in 1980?

18    A.   Yes, I was.

19    Q.   Did you know that then?

20    A.   Right -- right about that time, yes.

21    Q.   And do you know now that he was convicted of tax evasion

22    in 1985?

23    A.   Yes.

24    Q.   Did you know that then?

25    A.   About the same time, yes.

WILLIAM WALLER - CROSS

1    Q.   And do you know that -- fair to say he's also been held

2    civilly liable for making frivolous arguments in the

3    federal courts?

4    A.   Yes.

5    Q.   Are you aware of the book that he published?

6    A.   Which one?  He had several.

7    Q.   "The Federal Mafia" book?

8    A.   Yes.

9    Q.   And are you aware that federal courts enjoined him,

10   prohibited him from selling that book?

11   A.   Yes.

12   Q.   And that's because they concluded he was sponsoring tax

13   crimes?

14   A.   Yes.

15   Q.   What the courts concluded.  I'm not asking about your

16   opinion.

17   A.   Right.

18   Q.   Did you read the book?

19   A.   Yes, I did.

20   Q.   And this is the one where -- in the book he claims that

21   the federal judiciary's corrupt.  Do you believe that?

22   A.   No.

23   Q.   In the book he talks about his convictions; right?

24   A.   Yes.

25   Q.   And in the book he complains about the instructions that

WILLIAM WALLER - CROSS

1    were given to the jury; is that fair to say?

2    A.    Yes.

3    Q.    And in the book he includes the instructions that were

4    given to the jury; would you agree?

5    A.    I believe so.

6    Q.    And did you read those instructions that were given to

7    the jury in his case as they were reproduced in his book?

8    A.    That was quite some time ago.  I have not looked at it

9    any time recent.

10   Q.    You -- you testified in his criminal trial in 2005;

11   right?

12   A.    That's correct.

13   Q.    And that was -- this was his third criminal trial?

14   A.    His second or third, yeah.

15   Q.    And in that criminal trial he was convicted of 13 tax

16   felonies?

17   A.    I believe so.

18   Q.    He was sentenced to 162 months in federal prison?

19   A.    Yes.

20   Q.    Died in federal prison?

21   A.    Yes.

22   Q.    Now, besides -- you said that you'd followed him.  You

23   also mentioned Joe Banister.  Do you remember that?

24   A.    Yes.

25   Q.    And I think you said he was a criminal investigation

WILLIAM WALLER - CROSS

1   agent like Special Agent Peng; is that right?

2   A.   That's right.

3   Q.   And he had a background in accounting.  He was a CPA,

4   too?

5   A.   Yes.

6   Q.   And he's no longer a CPA; isn't that right?

7   A.   That's right.

8   Q.   Because he was stripped of his license; isn't that true?

9   A.   That's correct.

10   Q.   You mentioned Peymon Mottahedeh?

11   A.   Yes.

12   Q.   In the courtroom today?

13   A.   Yes.

14   Q.   Sitting back here, he's been watching this trial?

15   A.   Yes.

16   Q.   And he's the president of Freedom Law School; right?

17   A.   I believe so, yes.

18   Q.   Down in Florida?

19   A.   Yes.

20   Q.   And you say you believe so.  Do you know what Freedom Law

21   School is?

22   A.   Yes.

23   Q.   It's not like a -- accredited -- it's not a

24   degree-granting institution; is that fair?

25   A.   Right.

WILLIAM WALLER - CROSS

1    Q.   And Mr. Mottahedeh is not a lawyer; is that true?

2    A.   Correct.

3    Q.   In 2018, did you send Special Agent Peng Joe Banister's

4    book?

5    A.   Yes, I did.

6    Q.   Did you send him DVDs of Mr. Mottahedeh?

7    A.   Yes.

8    Q.   Now, about Freedom Law School, they put on various

9    symposia and they talk about taxes?

10   A.   Yes.

11   Q.   You're aware of them?

12   A.   Yes.

13   Q.   They do mock trials showing people how to present a

14   willfulness defense; isn't that right?

15   A.   I saw one, yes.

16   Q.   Okay.  So did you attend that program?

17   A.   I saw it, yes.

18   Q.   Okay.  So you watched the program, the mock trial?

19   A.   Yes.

20   Q.   Okay.  And they tell you in that program that it's

21   important to show the jury that you're sincere in your belief;

22   right?

23   A.   I believe so, yes.

24   Q.   Fair to say that Mr. Mottahedeh's record in the

25   Federal Court is not a winning record?

WILLIAM WALLER - CROSS

1    A.   I don't know his record.

2    Q.   Are you aware of him ever prevailing in a lawsuit in

3    Federal Court?

4    A.   Has he been convicted?  I don't know his record.

5    Q.   And oh, I'm sorry, to be clear, he's not been convicted

6    of any crimes as far as you know; right?

7    A.   I'm not aware, no.

8    Q.   Okay.  But he's filed many civil lawsuits in the

9    federal courts relating to taxes; right?

10   A.   Again, I'm not aware.  I don't know.

11   Q.   Now, you never consulted a tax attorney.  I think -- did

12   we already go over this in the morning?  Well, I'll just --

13            **MR. MAGNANI:**  I'm sorry.  I'll just ask him.

14   **BY MR. MAGNANI:**

15   Q.   You never consulted a tax attorney; right?

16   A.   No.

17   Q.   Never a CPA?

18   A.   No.

19   Q.   Never went to H&R Block?

20   A.   I did when I was a filer.

21   Q.   I'm sorry.  I should have been more clear.  In the period

22   of your time as a non-filer, you never went to H&R Block?

23   A.   No.

24   Q.   Or a similar tax preparation business?

25   A.   No.

WILLIAM WALLER - CROSS

1   Q.   So instead you followed the other folks that we've been

2   talking about?

3   A.   I followed my own beliefs and my own research, yes.

4   Q.   So -- okay.  Well, let me -- I guess I don't know if that

5   really answered the question.  I think I asked if you followed

6   those people.  You said yes, but is the answer no, you

7   followed your own research, or is it yes, that you followed

8   these people?

9   A.   It would be both.

10  Q.   Both?  Okay.

11  A.   Relied more on my own research.

12  Q.   And I believe on direct, did you say, To this day, no

13  one's been able to show me the law that makes me liable?

14  A.   That's correct.

15  Q.   Okay.  And we mentioned before the time when you put your

16  checkbook down in that CDP hearing?

17  A.   Yes.

18  Q.   And you told the appeals officer the same thing; right?

19  A.   Yes, I did.

20  Q.   And you testified about that on direct; right?

21  A.   I believe so.

22  Q.   Okay.

23        **MR. MAGNANI:**  If we could please have Exhibit 351.

24  And this has been admitted.

25  ///

WILLIAM WALLER - CROSS

1    **BY MR. MAGNANI:**

2    Q.    This is a lawsuit you filed in Federal Court?

3    A.    Yes.

4    Q.    Here in the District of Nevada?

5    A.    That's correct.

6    Q.    Is this the first lawsuit that you filed in

7    Federal Court?

8    A.    No.

9    Q.    Now, after the -- in this exhibit -- have you reviewed

10   this exhibit before?

11   A.    Years ago.

12   Q.    Do you know -- if you don't know, I can hand you a

13   physical copy.  But do you know if, after this filing, you

14   included a lot of attachments to your --

15   A.    Yes, that's correct.

16   Q.    Okay.  And this was the lawsuit that you filed disputing

17   the frivolous -- the 500-dollar frivolous penalty that

18   Ms. Morgan testified about; right?

19   A.    Correct.

20   Q.    And so just to go over that, so that was -- you filed the

21   zero return?

22   A.    Yes.

23   Q.    And the IRS sent you a letter asking -- giving you the

24   opportunity to correct the filing?

25   A.    Yes.

WILLIAM WALLER - CROSS

1    Q.    And you didn't correct the filing; right?

2    A.    Correct.

3    Q.    Okay.  And after that, a 500-dollar penalty was assessed?

4    A.    Yes.

5    Q.    And so you requested a CDP hearing?

6    A.    Correct.

7    Q.    You did not get the satisfaction you were seeking in the

8    CDP hearing?

9    A.    No, I didn't.

10   Q.    So you filed a lawsuit in Federal Court?

11   A.    Yes.

12         **MR. MAGNANI:**  Now, if we could please just go to

13   page 16 of this document.

14   **BY MR. MAGNANI:**

15   Q.    Now, throughout this trial, you remember Revenue Officer

16   Soto testifying; right?

17   A.    Yes.

18   Q.    And he was in the general program?

19   A.    Yes.

20   Q.    And then, do you remember Revenue Officer Ginger Wray

21   testifying?

22   A.    Yes.

23   Q.    She was in what's called the ATAT program?

24   A.    Right.

25   Q.    Do you remember what ATAT stands for?

WILLIAM WALLER - CROSS

1    A.    Abusive tax shelter something.

2    Q.    Abusive Tax Avoidance Transactions?

3    A.    Yes.

4    Q.    And she said Revenue Officer Soto didn't really have the

5    training or the caseload to be able to deal with complex

6    issues?

7    A.    Yes.

8    Q.    So before even interacting with a revenue officer in the

9    general program, you were dealing with what's called the --

10   like the automated collections branch; right?

11   A.    I don't -- that's what it says, yes.

12   Q.    Well, I mean, before actually assigning people to come

13   out and collect things, is it fair to say that, in your

14   earlier disputes with the IRS, it was mostly just automated

15   mailers and things like that?

16   A.    Yes, that's correct.

17   Q.    Now, there was a hearing -- after you noted your -- well,

18   actually, if we could just go to page 13.  This is your

19   request for a collections due process hearing?

20   A.    Um-hum, yes.

21   Q.    Also known as a CDP hearing?

22   A.    Correct.

23   Q.    And the hearing was held on August 21st --

24        **MR. MAGNANI:**  If we could go to page 18?

25   ///

WILLIAM WALLER - CROSS

1    **BY MR. MAGNANI:**

2    Q.   Was the hearing held on August 21st, 2001?

3    A.   Yes.

4    Q.   And did you bring a tape recorder to that hearing?

5    A.   Not a tape recorder.  I had a court reporter.

6    Q.   Oh.  You brought a court reporter?

7    A.   Yes.

8    Q.   Okay.  Is that Beatrice Conner?

9    A.   Correct.

10   Q.   And you paid for that court reporter to come?

11   A.   Yes.

12   Q.   It was important for you to have this record transcribed

13   and memorialized?

14   A.   Yes.

15   Q.   And you also brought an advocate with you, didn't you?

16   A.   Yes.

17   Q.   Do you remember who that advocate was?

18   A.   Cindy Neun.

19   Q.   And was Cindy Neun -- well, what was the appeals

20   officer's position, if you remember, about whether Cindy Neun

21   could represent you?

22   A.   She -- she could not represent me.  She could just be

23   there as a witness.

24   Q.   And do you remember why that was?

25   A.   Because it was my hearing.

WILLIAM WALLER - CROSS

```
1              MR. MAGNANI:  Well let's go to page 20, please.
2     And --
3              THE COURT:  What exhibit number is this now?
4              MR. MAGNANI:  It's still Exhibit 351, and we're just
5     on page 20, for the record.
6     BY MR. MAGNANI:
7     Q.   And at the very bottom third --
8              MR. MAGNANI:  Can you please blow up the bottom
9     third, Ms. Burgess?
10    BY MR. MAGNANI:
11    Q.   And is this sort of the discussion where the appeals
12    officer told Ms. Neun that she could not represent you because
13    she was not qualified to represent you?
14    A.   Yes.
15    Q.   And that was because she's not an attorney?
16    A.   Correct.
17    Q.   Or a CPA?
18    A.   Right.
19    Q.   Or an enrolled agent?
20    A.   Yes.
21    Q.   Do you know what an enrolled agent is?
22    A.   One who's enrolled with approval with the IRS.
23    Q.   And she wasn't any of those things; right?
24    A.   Correct.
25    Q.   In fact, wasn't she one of Irwin Schiff's co-defendants
```

WILLIAM WALLER - CROSS

1   in the trial that you testified?

2   A.   Yes.

3   Q.   And was she convicted in that trial?

4   A.   Yes.

5   Q.   Of numerous tax crimes?

6   A.   I believe so, yes.

7   Q.   Including willful failure to file?

8   A.   Yes.

9   Q.   Do you know if she went to prison?

10  A.   Yes.

11  Q.   Now, if we could go to page 28, please.  In -- now, and

12  just looking at the bottom half of the page where the agent is

13  talking, do you remember if, during this meeting, the appeals

14  agent, if he gave you court cases to read?

15  A.   I believe so.

16  Q.   Well, you can take a second, if you want to look at the

17  transcript, if that will help you remember.  Starting on

18  line 16.

19  A.   Yes.

20  Q.   So does that -- does that help you remember?

21  A.   Yeah.  That was 19 years ago, so yes.  Vaguely.

22  Q.   Okay.  Do you remember -- only if you remember, did you

23  read those cases?

24  A.   Back then I did, yes.

25  Q.   Okay.  But it didn't change your opinion?

WILLIAM WALLER - CROSS

1    A.    No.

2    Q.    And then if we could please go to the bottom of page 12.

3    This is a -- after you asked him --

4         **MR. MAGNANI:**  Just the agent's portion.

5    **BY MR. MAGNANI:**

6    Q.    This was after you asked him to basically show you the

7    law --

8         **MR. MAGNANI:**  Just one moment, Judge.  Sorry.

9         **THE COURT:**  Yes, sir.

10        **MR. MAGNANI:**  And I'm sorry.  Ms. Burgess, is this

11   page 12?

12   **BY MR. MAGNANI:**

13   Q.    Well, let me ask you this question.  Did -- did he ever

14   cite law to you?

15   A.    Did the appeals officer?

16   Q.    Yeah.

17   A.    He had mentioned -- he didn't show me the section that

18   made me liable, but he did mention other sections and other

19   court cases, yes.

20        **MR. MAGNANI:**  If I could just have one moment,

21   Your Honor.

22        **THE COURT:**  Yes, sir.

23        **MR. MAGNANI:**  And I'm sorry.  When I said page 12,

24   that's page 12 of the exhibit.  I actually meant, Ms. Burgess,

25   can we go to page 31?  I apologize.

WILLIAM WALLER - CROSS

 1  **BY MR. MAGNANI:**

 2  Q.   And in the -- this is where it says above --

 3           **MR. MAGNANI:**  Well, I'm sorry, could you zoom out for

 4  one second?  Ms. Burgess, if you could zoom in on the

 5  defendant's statement at line -- starting at line 7 to

 6  line 12.

 7  **BY MR. MAGNANI:**

 8  Q.   So this is -- this is the part of the hearing where you

 9  put the Internal Revenue Code before the agent and sort of

10  challenged -- him or her?  I don't know.

11           Do you remember the gender of the appeals officer?

12  A.   It was a male.

13  Q.   It was a male.

14           So this is when you sort of challenged him, and this

15  is where the -- the court reporter that you brought with you

16  indicated that you placed your checkbook in front of the

17  agent.  Do you remember this?

18  A.   Yes.

19           **MR. MAGNANI:**  And then, Ms. Burgess, if we could

20  please go down to the agent's response?

21  **BY MR. MAGNANI:**

22  Q.   And this is -- he said, "I'm glad you mentioned that or

23  asked me these questions.  And you might want to take some

24  notes and refer back in your tape."  And then he -- and then

25  he quoted a section to you, didn't he?

WILLIAM WALLER - CROSS

1    A.    Section 1, yes.

2    Q.    Now -- now, here it says Title 26.  Do you know what

3    Title 26 is?

4    A.    Yes.

5    Q.    Is that what is often referred to as the Internal Revenue

6    Code?

7    A.    That's correct.

8    Q.    And so he quoted the -- the first section of the Internal

9    Revenue Code to you; right?

10   A.    Yeah.  Section 1.

11   Q.    And that's the section that he told you made you liable?

12   A.    That's what he said.  But Section 1 is the imposition of

13   the tax and the rate of the tax.  There is no liability for

14   the tax in Section 1.

15   Q.    He also quoted some other sections to you, fair to say?

16   A.    Yes.

17   Q.    Did you take his advice and refer back to those sections

18   and read them over again?

19   A.    Yeah.  He was talking Chapter 61, 62, and 63 as far as

20   gross income defined, taxable income, but that's still -- the

21   liability section is not there.

22   Q.    So the answer's "yes"?

23   A.    Yes.

24   Q.    Okay.

25         **MR. MAGNANI:**  If we could please go to the next page?

WILLIAM WALLER - CROSS

1    And if you could just zoom in on sort of the top half of it?

2    **BY MR. MAGNANI:**

3    Q.   And as you're saying here, I mean, that's what you told

4    him.  You said, "Section 1 does not impose the tax."

5         **MR. MAGNANI:**  A little lower, please, Ms. Burgess.

6    If we could bring that all the way down to 14?

7    **BY MR. MAGNANI:**

8    Q.   You told him your position.  "Section 1 doesn't impose

9    the tax liability," and he said, "I know.  We disagree on it.

10   We believe Section 1 imposes the tax."

11        Is that right?

12   A.   Correct.

13   Q.   So fair to say, at that point, you guys sort of hit an

14   impasse?

15   A.   Correct.

16   Q.   Now, did he give you some other advice that you remember

17   before the end of the meeting?

18   A.   I don't recall.  You want to scroll down?

19        **MR. MAGNANI:**  Well, actually, Ms. Burgess, if we

20   could please jump to page 35?  And if I could ask you to zoom

21   in on lines 8 through 14.

22   **BY MR. MAGNANI:**

23   Q.   Before the meeting was over, didn't he tell you that you

24   could appeal to the courts but that you risked being

25   sanctioned for making what the courts would consider a

WILLIAM WALLER - CROSS

1  frivolous argument?

2  A.   Yes.

3  Q.   And, actually, if you...

4        Did he make that -- did he warn you of that multiple

5  times?

6  A.   Yes.

7  Q.   But you sued in court anyway, right, because this is

8  attached to your filing; right?

9  A.   That's correct.

10  Q.   So fair to say you were pretty confident you wouldn't be

11  sanctioned by the court?

12  A.   That's correct.

13  Q.   Okay.  Were you treated with respect, did you think, in

14  that meeting?

15  A.   In the meeting with the appeals officer?  Yes.

16  Q.   Yeah.  Okay.  Generally courteous, we agree to disagree,

17  that kind of thing?

18  A.   Yes.

19  Q.   Okay.

20       **MR. MAGNANI:**  And if we can go back to the first

21  page, please?

22  **BY MR. MAGNANI:**

23  Q.   When you filed this lawsuit, in addition to sue to

24  invalidate -- now, this is a lawsuit against the

25  United States; right?

WILLIAM WALLER - CROSS

1    A.    Yes.

2    Q.    And in addition to suing to invalidate the decision at

3    the CDP hearing, you also asked for some other remedies;

4    right?

5    A.    Yes.

6    Q.    Do you remember what those remedies were?

7    A.    Not at this time, no.

8    Q.    Okay.

9    A.    Nineteen years ago.

10          **MR. MAGNANI:**  If we could go to --

11   **BY MR. MAGNANI:**

12   Q.    Well, would it -- only if -- only if you know, were the

13   other remedies that you sought costs and also punitive damages

14   against the United States?

15   A.    Sure.

16          **MR. MAGNANI:**  And if we could please go to page 7 at

17   the bottom?

18   **BY MR. MAGNANI:**

19   Q.    And did you say in your lawsuit, sir, that it is clear

20   that the CDP hearing of August 21st, 2001, was not held in

21   accordance with law and that the determination at issue was a

22   fraud and a mockery?

23   A.    Yeah, I did say that.

24   Q.    Okay.  And I think you testified on direct that the court

25   did deny this lawsuit; right?

WILLIAM WALLER - CROSS

1    A.    Yes.

2    Q.    Was not a successful lawsuit?

3    A.    Correct.

4         **MR. MAGNANI:**  Could we please go to Exhibit 353?  And

5    if we could go to -- sorry -- the top third of page 2.

6    **BY MR. MAGNANI:**

7    Q.    Is this the order denying your lawsuit?

8    A.    Yes.

9    Q.    And in this the court wrote -- and I'm looking at line 6

10   -- "According to the attached statement, plaintiff's

11   self-assessment was based on the position that there's no

12   statutory income liability that applies to him and that his

13   wages do not constitute income."

14        Is that a fair characterization of your position in

15   your lawsuit?

16   A.    That was -- that was his ruling.  That's not what was

17   stated.

18   Q.    Well, I guess what I'm asking is, in the ruling he says

19   plaintiff, and he describes your position that you did not

20   believe there's a statutory income tax liability?

21   A.    Yeah, that's correct.

22   Q.    Okay.

23   A.    And the two court cases, too, I looked at those.  Neither

24   one of them applied to me.  One was on privilege, and the

25   other one was on wages as income.

WILLIAM WALLER - CROSS

1    Q.    Okay.

2    A.    Neither one were -- sorry.

3    Q.    No, no.  That's -- so -- so you did read those court

4    cases?

5    A.    Yes.

6    Q.    And they didn't change your view?

7    A.    No.  Because they didn't apply to me.  It wasn't the same

8    case.

9    Q.    But the Federal Court here thought that those cases said

10   that courts have found both these positions to be frivolous

11   and patently without merit?

12   A.    Yes.  And if I may speak, the --

13   Q.    Please.

14   A.    -- the judge in this case -- the 6330 hearing, one of the

15   items in the hearing said that I could obtain verification

16   from the secretary that all laws and applicable procedures had

17   been met.  And maybe it was an honest mistake, but the judge

18   quoted it as saying that at the appeals hearing the IRS is to

19   obtain verification that all laws and applicable procedures

20   have been met.  And that's not what the statute says.  So I'm

21   sure it was an honest mistake, but that's...

22         **MR. MAGNANI:**  Could we please go to page 7?

23   BY MR. MAGNANI:

24   Q.    Now, the -- fair to say --

25         **MR. MAGNANI:**  Actually, let's go to page 3.  If we

WILLIAM WALLER - CROSS

1    could just look at the -- I guess the bottom third.

2    **BY MR. MAGNANI:**

3    Q.   "Plaintiff's complaint contains a barrage of meritless

4    arguments which he insists the Court must address."

5         Do you remember that, line 16?

6    A.   I see it here, yes.

7    Q.   Okay.  But he does -- to your credit he says there is one

8    genuine issue; right?

9    A.   Um-hum, yes.

10   Q.   And that was with regards to the procedures used by the

11   IRS; is that right?

12   A.   Yes.

13   Q.   Okay.

14        **MR. MAGNANI:**  And if we could just page through the

15   rest of this exhibit.

16   **BY MR. MAGNANI:**

17   Q.   And is it fair to say that the Court went on to sort of

18   address each of those things that you raised in numbered

19   bullet -- you know, one at a time, each of your arguments, he

20   did address those?

21   A.   Yes.

22   Q.   Okay.  But at the end, right here in the conclusion

23   section, the Court ultimately disagreed with you and found

24   that your filing was frivolous; isn't that right?

25   A.   That's correct.

WILLIAM WALLER - CROSS

1          **MR. MAGNANI:**  And if we look at line -- I guess it's
2      sort of between 15 and 16.
3      BY MR. MAGNANI:
4      Q.   He said, "Finally, because plaintiff's complaint lacks
5      any merit, had the defendant moved for Rule 11 sanctions, this
6      Court would have freely granted such a motion."
7               Is that right?
8      A.   Yes.
9      Q.   So -- and the defendant in this case is the
10     United States; right?
11     A.   Yes.
12     Q.   Do you remember who the judge was in this case?
13     A.   I believe it was Dawson.  I'm not sure.
14          **MR. MAGNANI:**  Well, you can zoom out.
15          **THE DEFENDANT:**  Yes.  Kent Dawson.
16     BY MR. MAGNANI:
17     Q.   What do you know about Kent Dawson?
18     A.   He was presiding over Irwin Schiff's trial.
19          **MR. MAGNANI:**  Just a moment, please.
20               Can I have the ELMO, please?
21     BY MR. MAGNANI:
22     Q.   Now, you know, when you've been -- so he was the judge,
23     to your memory, that presided over the Irwin Schiff trial --
24     A.   I believe so, yes.
25     Q.   -- that you testified in?

WILLIAM WALLER - CROSS

1          And that was also the trial with Cynthia Neun, your

2     representative at that CDP hearing?

3     A.   Yes.

4     Q.   Okay.  Now, when you -- I'm showing --

5          **MR. MAGNANI:**  And can this be for the witness only?

6          **COURTROOM ADMINISTRATOR:**  Yes.

7          **MR. MAGNANI:**  Okay.

8     **BY MR. MAGNANI:**

9     Q.   I'm showing you what's been marked as Government's 198.

10    What is Government's 198?

11    A.   Portraits of some judges here in the building.

12    Q.   Are those the three portraits in front of the elevator

13    outside on this floor?

14    A.   I believe so, yes.

15         **MR. MAGNANI:**  Move to admit this exhibit as a picture

16    of the hallway in this court.

17         **MR. BECRAFT:**  Relevance, Your Honor.

18         **THE COURT:**  What's the relevance of this?

19         **MR. MAGNANI:**  He testified about remembering

20    Judge Dawson.  I just want to make sure he has the right

21    person.

22         **MR. BECRAFT:**  Pictures of judges?  There's no dispute

23    that he's -- the government's not disputing, you know, that he

24    correctly pointed out Judge Dawson.  To offer a picture --

25         **THE COURT:**  Yeah.  I really don't see the relevance

WILLIAM WALLER - CROSS

1    of this.

2    **BY MR. MAGNANI:**

3    Q.   Do you -- every day --

4         **THE COURT:**  The documents all show that Dawson was

5    the judge; right?

6         **MR. MAGNANI:**  Well, we haven't admitted any documents

7    from the Schiff trial.

8         **THE COURT:**  Well, I understand that.  But you've

9    looked at the decisions; right?  And they're all -- they were

10   from Judge Dawson.

11        **MR. MAGNANI:**  The order that we were just testifying

12   about in the CDP hearing does have Judge Dawson's -- you know,

13   it's a Judge Dawson order.  But in terms of if there's any

14   evidence in the record besides the testimony that -- that the

15   defendant's memory is right that it was Judge Dawson, I don't

16   think there's anything in the record.  But it's obviously not

17   a major point, Your Honor.

18        **THE COURT:**  I don't think it's that relevant.

19        **MR. MAGNANI:**  Okay.

20        **THE COURT:**  I don't think it's relevant, I should

21   say.

22   **BY MR. MAGNANI:**

23   Q.   So when you've been coming to court every day, you walk

24   past the portraits of those judges; right?

25   A.   Yes.

WILLIAM WALLER - CROSS

1    Q.    Judge Mahan and Judge Dawson?

2    A.    Yes.

3    Q.    And you're familiar with both of those judges?

4    A.    I am now, yes.

5    Q.    And are you familiar that those judges' positions on the

6    law are different than yours?

7    A.    Correct.

8    Q.    Now --

9           MR. MAGNANI:  Just one second, Your Honor.

10   BY MR. MAGNANI:

11   Q.    Now, I know before I think we talked about, in

12   Irwin Schiff's book how he talked about the jury instructions

13   in his trial, and he didn't think those were fair?

14   A.    Yes.

15   Q.    Have you had the opportunity to talk to your lawyer about

16   the jury instructions in this case?

17   A.    We have.

18   Q.    And so would it surprise you if the -- if the judge told

19   the jury something like, if the defendant made more than a

20   certain amount in a certain year, he was required to file?

21   A.    On the government's jury instruction?

22   Q.    Well, I'm asking about the instruction -- would it

23   surprise you if the judge's instruction was that?

24   A.    That would be probably one of a few, yes.

25   Q.    Okay.  Would it surprise you if the judge told the jury

WILLIAM WALLER - REDIRECT

1    that merely disagreeing with the law does not constitute a

2    good-faith misunderstanding because all persons have a duty to

3    obey the law, whether or not they agree with it?

4    A.   Correct.  That's correct.  I agree with the law.

5              **MR. MAGNANI:**  I have no further questions.

6              **THE COURT:**  All right.  Anything on redirect?

7              **MR. BECRAFT:**  Briefly, Your Honor.

8              **THE COURT:**  Well, don't get my hopes up.

9                          **REDIRECT EXAMINATION**

10   **BY MR. BECRAFT:**

11   Q.   Mr. Waller, I've got just a few areas I want to talk --

12   touch, and then I want to end it.

13             Do you remember, during this morning's

14   cross-examination by the government, that they brought up

15   Exhibit No. 195, this document about -- titled "Truth About

16   Frivolous Arguments"?

17   A.   Correct.

18   Q.   Okay.  I'm going to ask some questions about that.

19   A.   Sure.

20   Q.   Do you have a judgment or recollection as to when the

21   first time it was that you saw this?

22   A.   Quite a few years ago.

23   Q.   Well, about how many?  I need a pretty good guess --

24   A.   I'd say 10 to 15 years ago.

25   Q.   And who provided it to you?

WILLIAM WALLER - REDIRECT

1    A.   I got it from the IRS.

2    Q.   Was it mailed to you?

3    A.   Yes.

4    Q.   About sometime in the first decade of this century; is

5    that a fair --

6    A.   Yeah, it would be fair.

7    Q.   Okay.  But you can't recall the specific year?

8    A.   No.

9    Q.   Have you received it more than one time?

10   A.   I honestly don't recall.

11   Q.   Have you looked on the Internet to look and see about

12   this book or this publication of the IRS?

13   A.   Well, years ago, yes.

14   Q.   When you received it, did you sit down and read it?

15   A.   I wouldn't say I studied it.  I did read through it, yes.

16   Q.   Okay.  Did you see -- at the time -- the day before you

17   started reading this, what was your belief about your

18   requirement to file federal income tax returns?

19   A.   It's still the two issues.  It's collected under

20   voluntary compliance, and there's no statutory law that makes

21   me liable.

22   Q.   Now, when you read this document, did you see any place

23   in it where what your belief was, was addressed?

24   A.   Yes.

25   Q.   Well, did you see your belief -- I'm not liable -- talked

WILLIAM WALLER - REDIRECT

1     about in this document?

2     A.    I believe so, yes.

3     Q.    Whereabouts?

4     A.    Oh, I'd have to look through it again.

5     Q.    Do you have it in front of you?

6     A.    Yeah.

7     Q.    Okay.  Good.

8     A.    The voluntary nature of the federal tax system, the

9     filing of a tax return is voluntary.

10    Q.    No.  Listen to my question.  My question was:  Just a

11    moment ago you told me one argument that you have, I'm not

12    liable.  Was that argument the subject of any analysis in

13    Government Exhibit 195?

14              **THE COURT:**  If you remember.

15              **THE DEFENDANT:**  I don't remember.  That's why I was

16    looking through.

17    **BY MR. BECRAFT:**

18    Q.    Well, looking at the first page of Government

19    Exhibit 195, which is titled "The Truth About Frivolous

20    Arguments," is that a table of contents?

21    A.    Yes.

22    Q.    Are the second and third pages part of that same table of

23    contents?

24    A.    Yes.

25    Q.    Now, listen to my question.  Look through that table of

WILLIAM WALLER - REDIRECT

1    contents, and do you see any -- anything like a topic being

2    that you're not liable being addressed by this document?

3    A.    No.  Not on liability, no.

4    Q.    Okay.  On the first three pages?

5              THE COURT:  It's been asked and answered.  He says

6    no.

7              MR. BECRAFT:  Yeah.  Okay.

8    BY MR. BECRAFT:

9    Q.    Can you take a quick 30 seconds and just scan through the

10   remainder from page 4 through the end of this document and see

11   if you see anything that does address your arguments.

12   A.    Well, the voluntary issue does.  Compliance with

13   administrative summons issued.  Not in regards to liability.

14   Not yet.

15   Q.    Good enough.  Are you through?

16   A.    Yes.

17   Q.    Okay.  Good enough.  I'll ask my next question.

18              Did you ever know Al Capone personally?

19   A.    No.

20   Q.    Do you know Pete Rose personally?

21   A.    No.

22   Q.    Any of those other parties that the government was asking

23   you questions about on direct --

24   A.    No.

25   Q.    -- do you know them personally?

WILLIAM WALLER - REDIRECT

```
 1   A.   No, not at all.
 2   Q.   How do you know anything about those people?
 3   A.   Just through --
 4   Q.   Like Wesley Snipes.
 5   A.   Just through history and the media.
 6   Q.   Through the media?
 7   A.   Sure.
 8   Q.   Okay.  Have you heard, also through the media, parties
 9   that are in different circumstances from Al Capone, Pete Rose,
10   Wesley Snipes?
11   A.   You mean in regards to victories?
12   Q.   Right.
13   A.   Yes.  Yeah, there's --
14   Q.   And what have you --
15   A.   -- quite a few.
16   Q.   -- heard?
17   A.   I'm sorry?
18   Q.   What have you heard?
19   A.   Oh, there's a list equal in length as far as the ones
20   that have lost to the ones that have won.  I mean, there's
21   Vernie Kuglin.  There's Tommy Cryer, Whitey Harrell,
22   Joe Banister.  There's others that had victories that...
23   Q.   Okay.  If you had heard through the media that Al Capone,
24   Pete Rose, and Wesley Snipes were convicted, did that have any
25   impact upon your beliefs regarding whether or not you were
```

WILLIAM WALLER - REDIRECT

1    required to file federal income tax returns?

2    A.   No.  I don't -- I didn't know what -- if they were

3    filers.  I don't know their tax situation.  No.

4    Q.   Okay.  Now, what, if any, impact upon your beliefs did

5    these -- this information you heard through the media about

6    these other parties that you mentioned -- I think you

7    mentioned Vernie Kuglin and Tommy Cryer and others.  What did

8    that have upon your beliefs?

9    A.   They were actually similar cases.  They were non-filers,

10   didn't file returns, and they had victories, yes.

11   Q.   Now, at the start of the cross-examination this morning,

12   the government's asking you questions about the elements of

13   this case.  One of the counts in the indictment, you're

14   familiar with it, charges you with impeding and impairing and

15   defeating the activities of the IRS.  Do you remember that

16   line of questions?

17   A.   Yes.

18   Q.   And at any stage during the relevant periods we're

19   talking about here, let's say from 1999 all the way up through

20   the end of 2016, did you do anything to impede the functions

21   of the IRS?

22   A.   No.  I was just acting on my legal right to challenge

23   these assessments, challenge these hearings, these levies,

24   these liens.  I didn't do anything to impede.  I was just

25   exercising my legal authority.

WILLIAM WALLER - REDIRECT

1  Q.   What, if any, thoughts did you ever have -- well, let

2  me -- let me rephrase it this way.

3          At some stage Mr. Soto, his name became known to you.

4  At some stage the name of Justin Bourne became known to you;

5  right?

6  A.   Yes.

7  Q.   Can you list some of the other names of people you may or

8  may not have met from the IRS during this relevant time frame

9  that you came to know?

10  A.   Ginger Wray.   Thomas Manaw (phonetic).

11  Q.   Any others?

12  A.   Not that I can think of.

13  Q.   All right.  Did you ever intend or plan to go out and, as

14  to those people, do something malicious to them?

15  A.   No.

16          **THE COURT:**  That's a leading question again.

17          **MR. BECRAFT:**  Okay.

18          **THE DEFENDANT:**  Do something -- no.

19  **BY MR. BECRAFT:**

20  Q.   What, if any, plans did you make to impede any of those

21  parties?

22  A.   I never intended to do any impeding whatsoever.  Like I

23  said, I was just acting on my legal authority, whether through

24  the administration side of the IRS or through the legal side,

25  through the courts, just exercising my rights.

WILLIAM WALLER - REDIRECT

1    Q.   All right.  Now, you were also asked by the government

2    this morning, during your cross-examination, about defeating

3    the IRS.  And I'm not going to repeat the same names, but did

4    you ever have any plan to -- what, if any, plan did you have

5    to, quote, defeat the people I just named or any others?

6    A.   I never had a plan to defeat anybody.  I didn't -- you

7    know, the tax liens that they were talking about, they just

8    expired.  The one for, what, $700,000, that was ten years, and

9    it just fell off.  I never planned on defeating anybody or

10   impeding, for that much.

11   Q.   All right.  Now, do you have -- off the top of your head

12   right now, as you sit there, what, if any, memory do you have

13   about when that lien expired?

14           THE COURT:  What lien is that now?

15           MR. BECRAFT:  The one he just mentioned, which would

16   be prior to 2004, for 2003 and before.

17           THE DEFENDANT:  I believe it was 2013 or 2014.

18   BY MR. BECRAFT:

19   Q.   So as you sit there, what's your knowledge about when

20   that lien expired?

21   A.   What's my knowledge about it?

22   Q.   Yeah.

23   A.   Just that it -- the time limit had elapsed on it, and

24   it -- it was -- it's supposed to be 10 years and 30 days, and

25   I think that time limit had expired.  And I got a notice from

WILLIAM WALLER - RECROSS

1    the county recorders that it had dropped off.

2    Q.   Okay.  At some stage you first learned about that lien.

3    Am I correct?

4    A.   Yes.

5    Q.   Now, from that point in time, whenever that was that you

6    learned, until you got this notice from Clark County --

7    A.   Yes.

8    Q.   -- between those two times, can you tell us everything

9    that you did to defeat the IRS in the collection of that tax

10   lien?

11            THE COURT:  Well, he said he didn't.

12            THE DEFENDANT:  I didn't.

13   BY MR. BECRAFT:

14   Q.   Okay.  What would it take to get you to file income tax

15   returns?

16   A.   Well, the same thing I've been asking for 20 years.  If

17   somebody can show me -- somebody show me the statute in text

18   that makes me liable to pay the tax, I would get back into the

19   system, and I would pay the tax.

20            MR. BECRAFT:  Nothing further, Your Honor.

21            THE COURT:  Recross?

22            MR. MAGNANI:  Just very briefly.

23                        RECROSS-EXAMINATION

24   BY MR. MAGNANI:

25   Q.   Mr. Waller, Mr. Becraft asked you --

WILLIAM WALLER - RECROSS

1           **THE COURT:**  Come up so we can -- I want to be sure we

2    get you on record.

3    **BY MR. MAGNANI:**

4    Q.   You just testified on redirect about victories that

5    you've heard of; right?

6    A.   Yes.

7    Q.   That was your word, "victories"?

8    A.   They won in court, yes.  They were acquitted.

9    Q.   Right.  So you mean these are people who were acquitted

10   of tax crimes?

11   A.   Yes.

12   Q.   And you're hoping to follow in their example, fair to

13   say?

14   A.   Yes.

15   Q.   And in this case you put -- you're putting on a

16   willfulness defense; is that right?

17   A.   Yes.

18   Q.   And so is that why, in preparing for your defense today,

19   you attended those Freedom Law School -- or you watched those

20   Freedom Law School seminars where they do mock trials and try

21   to teach people how to persuade a jury --

22   A.   That had nothing --

23   Q.   -- not to appear willful?

24   A.   No, that had nothing to do with it.

25   Q.   Nothing to do with it?

WILLIAM WALLER - RECROSS

1    A.    No.

2    Q.    Okay.

3          **MR. BECRAFT:**  Nothing further.  And the defense

4    rests, Your Honor.

5         *(End of excerpted proceedings at 2:16 p.m.)*

6                        --o0o--

7              COURT REPORTER'S CERTIFICATE

8

9         I, AMBER M. McCLANE, Official Court Reporter, United

10   States District Court, District of Nevada, Las Vegas, Nevada,

11   do hereby certify that pursuant to 28 U.S.C. §753 the

12   foregoing is a true, complete, and correct transcript of the

13   proceedings had in connection with the above-entitled matter.

14

15   DATED:  3/25/2019

16

17   /s/ *Amber M. McClane*
                                    _____
18              AMBER M. McCLANE, CCR NO. 914

19

20

21

22

23

24

25